## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

_____

|  |  |  |
|---|---|---|
| MARY SAUCEDO, | ) | |
| MAUREEN P. HEARD, and | ) | |
| THOMAS FITZPATRICK, D.B.A. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case. No. 1:17-cv-183 |
| | ) | |
| WILLIAM M. GARDNER, Secretary of | ) | |
| State of the State of New Hampshire, in his | ) | |
| official capacity, and THE SECRETARY | ) | |
| OF STATE'S OFFICE OF THE STATE | ) | |
| OF NEW HAMPSHIRE, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Mary Saucedo, Maureen P. Heard, and Dr. Thomas Fitzpatrick, D.B.A. (collectively, "Plaintiffs"), by and through the undersigned attorneys, bring this action against Defendant William M. Gardner, in his official capacity as New Hampshire Secretary of State, and Defendant New Hampshire Secretary of State's Office (collectively, "Defendants") pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, to secure equitable relief for the unlawful deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States.

## SUMMARY OF THE CASE

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  Yet, during each New Hampshire general election, hundreds of eligible voters—many of

whom are seniors and individuals with disabilities—are disenfranchised under a New Hampshire statute that requires local election officials ("moderators") to reject an absentee ballot if it "appears" that the signature on the absentee ballot affidavit envelope does not match the signature on the absentee ballot application. *See* Revised Statutes Annotated of the State of New Hampshire ("RSA") § 659:50(III) (2010). Plaintiffs, and likely hundreds of other qualified voters, were disenfranchised in the November 2016 election under this statute. Even one disenfranchised voter—let alone hundreds—is too many. And no voter should be disenfranchised simply because of penmanship.

When a moderator decides to reject an absentee ballot under RSA § 659:50(III), the voter is never informed of this decision by Defendants or anyone else. Nor is the voter given an opportunity to cure the moderator's perceived "signature mismatch" concern. Instead, the voter must somehow know to independently investigate the status of his or her ballot by going to the Secretary of State's website, where he or she may learn whether and why the absentee ballot was rejected. This website is not updated until after the election. As a result, by the time the Defendants make information on rejected absentee ballots available to Plaintiffs and other voters, it is too late. The voter has been disenfranchised and there is nothing that can be done about it.[1]

Moderators do commendable work administering New Hampshire elections. But RSA § 659:50(III) puts moderators—who are laypeople with no handwriting training—in the unenviable position of acting as handwriting experts. There is no formalized statewide procedure for moderators to evaluate whether an absentee ballot envelope signature matches the signature used to apply for the absentee ballot. If the signatures on the absentee ballot

---

[1] It is because of similarly severe burdens on the right to vote that the United States District Court for the Northern District of Florida deemed unconstitutional a comparable law. *See Florida Democratic Party v. Detzner*, No. 4:16-cv-00607-MW-CAS, 2016 WL 6090943, *9 (N.D. Fla. Oct. 16, 2016) (issuing preliminary injunction against law permitting canvassing boards to reject ballots deemed "illegal" based on purportedly mismatching signatures).

application and the absentee ballot affidavit envelope "appear" to be different to the moderator, he or she has no choice but to reject the ballot.  This statute compels moderators to disenfranchise disabled, blind, and senior absentee voters who require the assistance of others to sign their names on the absentee ballot application or affidavit envelope.

RSA § 659:50(III) is particularly problematic for legitimate voters who, like legally blind Plaintiff Mary Saucedo, are seniors and individuals with disabilities.  Seniors and individuals with disabilities are more likely to have poor handwriting, signatures that have changed, or an inability to sign the same way twice.  Moreover, seniors and individuals with disabilities are more likely to need the assistance of someone to sign their name—an event that could cause the voter to be disenfranchised because the signatures will inevitably "appear" to be executed by different persons.  This disenfranchising effect runs contrary to the express provision in New Hampshire law specifically allowing a blind person, such as Plaintiff Ms. Saucedo, when signing the absentee ballot affidavit envelope, to swear that he or she "had assistance in marking the ballot and sealing" the ballot.  RSA § 657:7(II)(b).

The New Hampshire Attorney General's Office has expressed concern with the application of RSA § 659:50(III).  During the 2016 general election, the New Hampshire Attorney General's Office explained to moderators that they should use caution in rejecting voters due to "signature mismatch."  As the Attorney General's Office stated in its October 31, 2016 memorandum: "Moderators should be aware that a person's signature often varies depending on the circumstances, and it is often hard to tell whether two signatures were written by the same person.  Because a mistake will deprive a citizen of his/her constitutional right to vote, moderators should take great care before ruling a ballot invalid because of signature differences."  *See Exhibit A*, Oct. 31, 2016 A.G. Memo. at p. 4.  Nonetheless, as with prior

elections, hundreds of voters were likely disenfranchised during the 2016 general election, along with the three Plaintiffs. The signature non-match determination can also impact close elections. For example, at least two voters at the Laconia Rehabilitation Center were disenfranchised during the 2016 general election under this regime, which is especially meaningful given that the Senate District 7 race—which covers Laconia—was decided by only 17 votes.[2]

For these reasons and the reasons below, RSA § 659:50(III) violates the First and Fourteenth Amendments to the United States Constitution, as well as Title II of the ADA.

## THE PARTIES

1.     Plaintiff Mary Saucedo is a U.S. citizen and registered voter, domiciled in Manchester, New Hampshire. She has lived there for 33 years. She is 94 years old. Before retiring, she worked at the U.S. Department of Veterans Affairs for approximately 30 years, as well as at civilian hospitals serving the military for approximately 15 years. She is an individual with a disability for purposes of the ADA, as she is legally blind due to advanced macular degeneration. As a result, she requires the assistance from her 86-year-old husband of 51 years, Agustine Saucedo, to fill out her absentee ballot application and ballot. Ms. Saucedo attempted to vote by absentee ballot during the 2016 general election due to her disability. She received an absentee ballot application in the mail. Because she is legally blind, she authorized Mr. Saucedo to fill out the application for her, sign her name on her behalf, and mail it to the Manchester clerk's office. Ms. Saucedo then received her absentee ballot in the mail. When she filled it out, she again needed the assistance of her husband, who helped her sign the affidavit envelope and complete the ballot due to her blindness. This absentee ballot was then mailed to the Manchester clerk's office. On election day, Ms. Saucedo's ballot was rejected by Manchester's Ward 2

---

[2] Allie Morris, *After Recount, Andrew Hosmer Concedes State Senate Race to Harold French*, Concord Monitor, Nov. 21, 2016, *available at* http://www.concordmonitor.com/Andrew-hosmer-concedes-district-7-state-senate-recount-to-harold-french-6294299.

moderator on the ground that the signature on the absentee ballot affidavit envelope did not match the signature on the absentee ballot application under RSA § 659:50(III). Ms. Saucedo was not aware that she had been disenfranchised until early 2017 when she was informed of this fact by the ACLU of New Hampshire ("ACLU-NH"). As a blind voter, Ms. Saucedo was entitled under state law to obtain the assistance of others in completing the absentee ballot process. *See* RSA § 657:7(II)(b). Due to her disability, Ms. Saucedo will rely on her husband's assistance to complete her absentee ballot application and absentee ballot in upcoming elections. Indeed, due to Ms. Saucedo's blindness, her husband has routinely helped her vote in prior elections for at least the last 12 years, whether by absentee ballot or in the polling place. *See* RSA § 659:20; *see also* RSA § 659:20-a. To the best of her knowledge, Ms. Saucedo has not missed a presidential or mid-term election since moving to New Hampshire in 1984.

2.     Plaintiff Maureen Heard is a U.S. citizen and registered voter, domiciled in Derry, New Hampshire. She has lived there for over 14 years. She is a 20-year military veteran, having served in both the Air Force and Coast Guard. She is a former member of the Derry Planning Board. She attempted to vote by absentee ballot during the 2016 general election, as she was temporarily working in the District of Columbia at the time. Prior to going to the District of Columbia, on approximately September 30, 2016, she went to the Derry clerk's office, completed and signed an absentee ballot application, and handed it to the clerk. On approximately October 7, 2016, she received her absentee ballot by mail at her temporary address in the District of Columbia. It was the only piece of mail that she received at that temporary address. While in the District of Columbia, she completed her ballot and signed the absentee ballot affidavit envelope. She then sealed the envelope. As she was in Derry before the election, she took the sealed ballot and dropped it off by hand at the Derry clerk's office on

approximately October 17, 2016.  On Election Day, Ms. Heard's ballot was rejected by Derry's moderator on the ground that the signature on the absentee ballot affidavit envelope did not match the signature on the absentee ballot application under RSA § 659:50(III).  This is reflected on the Secretary of State's website, which states that "Affidavit Signature Does Not Match Request."  Ms. Heard was not aware that she had been disenfranchised until early 2017 when he was informed of this fact by the ACLU-NH.

3.      Plaintiff Dr. Thomas Fitzpatrick, D.B.A. is a U.S. citizen and registered voter, domiciled in New Hampton, New Hampshire.  He has lived there for nearly 30 years.  He attempted to vote by absentee ballot during the 2016 general election, as he works in Maine four (4) hours away from his New Hampton home and was working there on Election Day.  Prior to the election, he went to the New Hampton clerk's office, completed and signed an absentee ballot application, and handed it to the clerk.  He received his absentee ballot, he believes, by mail.  He completed his ballot and signed the absentee ballot affidavit envelope on the dashboard of his car.  He then sealed the envelope.  He took the sealed ballot and dropped it off by hand at the New Hampton clerk's office, as he was concerned about it being lost in the mail.  On Election Day, Dr. Fitzpatrick's ballot was rejected by New Hampton's moderator on the ground that the signature on the absentee ballot affidavit envelope did not match the signature on the absentee ballot application under RSA § 659:50(III).  Dr. Fitzpatrick was not aware that he had been disenfranchised until early 2017 when he was informed of this fact by the ACLU-NH.  Due to Dr. Fitzpatrick's out-of-state employment, he is absent from his town of domicile on certain weekdays and will likely vote by absentee ballot in upcoming elections.

4.      Defendant William M. Gardner is the Secretary of State of the State of New Hampshire.  He is named in his official capacity only.  He is in charge of administering New

Hampshire's election laws.  He also prepares the election procedure manual pursuant to RSA § 652:22, which states that "[a]bsentee ballots should be rejected because the signatures do not match only if the differences in the signatures are significant."  N.H. Dep't of State, N.H. Election Procedure Manual: 2016-2017, 38, *available at* http://sos.nh.gov/Elections.aspx.  His office is located at State House, Room 204, Concord, NH 03301.  He is also a representative of a "public entity" for purposes of Title II of the Americans with Disabilities Act.  *See* 42 U.S.C. § 12131(1).  Secretary Gardner, personally and through the conduct of his agents, servants, and employees, acted under color of state law at all times relevant to this action.

5.     This action is also brought against the Secretary of State's Office of the State of New Hampshire.  This Defendant is a "public entity" as defined in Title II of the Americans with Disabilities Act.  *See* 42 U.S.C. § 12131(1).

## JURISDICTION AND VENUE

6.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, and the ADA, 42 U.S.C. § 12101 *et seq.*  This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331.

7.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## FACTS

### I.     The Absentee Ballot Process

9.     Like all states, New Hampshire allows a voter to cast a ballot through the mail.  In New Hampshire, however, a voter can only vote by mail if he or she submits an absentee ballot application declaring that he or she is unable to vote at the polling place on Election Day due to

absence, religious observance, or a disability.[3]  *See* RSA § 657:4 (absentee application form where voter declares that he or she is "absent on the day of the election," "cannot appear in public on election day because of observance of a religious commitment," or is "unable to vote in person due to a disability"); *see also* RSA § 657:1 ("Any person who is absent on the day of any state election from the city, town, or unincorporated place in which he or she is registered to vote or who cannot appear in public on any election day because of his or her observance of a religious commitment or who is unable to vote there in person by reason of physical disability may vote at such elections as provided in this chapter."); RSA § 657:7(II)(a)-(b).  This absentee ballot application form is attached as *Exhibit B*.

10.     After a voter completes his absentee ballot application form where he declares that he is unable to vote in person due to absence, religious observance, or a disability, the voter is sent a blank absentee ballot by mail.  This absentee ballot is accompanied by an affidavit that is printed on the envelope in which the voter is to place the marked ballot.

11.     For voters who have requested an absentee ballot because they are absent from the city or town on election day, the affidavit to be signed accompanying the marked ballot states as follows:

> I do hereby certify under the penalties for voting fraud set forth below that I am a
> voter in the city or town of _____, New Hampshire, in ward ___; that I will be

---

[3] During the 2016 general election, 75,305 voters cast absentee ballots out of 755,850 ballots cast—a rate of approximately 10%.  *See* N.H. Secretary of State, Ballots Cast—Names on Checklist—2016 General Election, *available at* http://sos.nh.gov/2016BallotsGen.aspx?id=8589963683.   In 2014, approximately 33,016 voters cast absentee ballots out of 462,737 ballots cast—a rate of approximately 7%.  *See* U.S. Election Assistance Commission, The 2014 EAC Election Administration and Voting Survey Comprehensive Report 201 (Table 28), 206 (Table 29) (June 30, 2015), *available at* https://www.eac.gov/assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf; N.H. Secretary of State, Ballots Cast and Names on Checklist - 2014 General Election, *available at* http://sos.nh.gov/Elections/Election_Information/2014_Elections/General_Election/Ballots_Cast_and_Names_on_Checklist_-_2014_General_Election.aspx.  During the 2012 general election, approximately 69,354 voters cast an absentee ballot in New Hampshire out of 718,700 ballots cast—a rate of approximately 9%.  *See* U.S. Election Assistance Commission, 2012 Election Administration and Voting Survey 24 (Table 28), 30 (Table 29), 36 (Table 31), 39 (Table 32), 46 (Table 33C) (September 2013), *available at* https://www.eac.gov/assets/1/1/990-050%20EAC%20VoterSurvey_508Compliant.pdf.

unable to appear at any time during polling hours at my polling place because I will be working on election day or will be otherwise absent on election day from said city or town and will be unable to vote in person; that I have carefully read (or had read to me because I am blind) the instructions forwarded to me with the ballot herein enclosed, and that I personally marked the ballot within and sealed it in this envelope (or had assistance in marking the ballot and sealing it in this envelope because I am blind) . . . .

(Signature) _____

*See* RSA § 657:7(II)(a).

12.     For voters who have requested an absentee ballot because they are unable to vote because of a religious observance or physical disability, the affidavit to be signed accompanying the marked ballot states as follows:

I do hereby certify under the penalties for voting fraud set forth below that I am a voter in the city or town of _____, New Hampshire, in ward _____; that I will be observing a religious commitment which prevents me from voting in person or that ***on account of physical disability I am unable to vote in person***; that I have carefully read (or had read to me because I am blind) the instructions forwarded to me with the ballot herein enclosed, and that I personally marked the ballot within and sealed it in this envelope (***or had assistance in marking the ballot and sealing it in this envelope because I am blind***).

(Signature) _____

*See* RSA § 657:7(II)(b) (emphasis added).

13.     The voter is tasked with signing this affidavit, completing the ballot, and then placing this marked ballot in the envelope containing his or her signed affidavit.  The voter then places this envelope with the affidavit and completed ballot in a larger envelope that is addressed and mailed to the local town or city clerk.

## II.     RSA § 659:50(III) and its Application

14.     On Election Day, absentee ballots are processed by moderators at each polling place.

15.     One of the many tasks moderators must perform concerning these absentee ballots is to determine whether "[t]he signature on the affidavit [envelope containing the absentee ballot] appears to be executed by the same person who signed the application" for the absentee ballot. RSA § 659:50(III).  In essence, this statute requires moderators to reject absentee ballots which, in their judgment, appear to contain signatures on the absentee ballot affidavit envelope that differ from the signatures on the absentee ballot application.

16.     Unfortunately, during each New Hampshire general election, hundreds of voters—many of whom are seniors and individuals with disabilities—are disenfranchised under RSA § 659:50(III).

17.     During the 2012 general election, approximately 321 voters were disenfranchised under this statute (which was 18% of 1,735 absentee ballots rejected that year).  *See* U.S. Election Assistance Commission, 2012 Election Administration and Voting Survey 42 (Table 33A) (September 2013), *available at* https://www.eac.gov/assets/1/1/990-050%20EAC%20VoterSurvey_508Compliant.pdf.

18.     During the 2014 general election, approximately 145 voters were disenfranchised under this statute (which was 18.5% of the 782 absentee ballots rejected that year).  *See* U.S. Election Assistance Commission, The 2014 EAC Election Administration and Voting Survey Comprehensive Report 219 (Table 33a) (June 30, 2015), *available at* https://www.eac.gov/assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf.

19.     When a moderator rejects an absentee ballot under this statute, the voter is never informed of this decision.

20.     Nor is the voter given an opportunity to cure any concerns the moderator may have with this perceived "signature mismatch."

21.     Instead, the voter is left ignorant to the fact that he or she has been disenfranchised unless the voter knows to go to the Secretary of State's website where he or she may "determine whether the absentee ballot . . . was challenged and rejected by the moderator on election day, including the reason for the challenge."   RSA § 657:26;   *see* https://app.sos.nh.gov/Public/AbsenteeBallot.aspx.   This website is not updated until after the election.   Thus, by the time the voter is able to successfully learn the status of their ballot, it is too late.   The voter has already been disenfranchised.

22.     RSA § 659:50(III) puts moderators in the difficult position of acting as handwriting experts.   Of course, moderators are lay people who do not undergo formal handwriting-analysis education or training.

23.     This statute also compels moderators to disenfranchise seniors and individuals with disabilities who require the assistance of others to sign their names on the absentee ballot affidavit envelope.

24.     Furthermore, despite its grave effect of rendering voters' ballots invalid, there are no meaningful formalized statewide standards or procedures for moderators to evaluate whether an absentee ballot envelope signature matches the signature used to apply for the absentee ballot. The only written guidance provided by the Secretary of State is in the Elections Manual, which states:

> The test for whether the application and affidavit appear to be signed by the same person is whether this is more likely than not.  Absentee ballots should be rejected because the signatures do not match only if the differences in the signatures are significant.

N.H. Dep't of State, N.H. Election Procedure Manual: 2016-2017, 38, *available at* http://sos.nh.gov/Elections.aspx.   The Election Manual further notes: "[I]t is a natural and common occurrence that a person's signature will change over time and will have differences

even when the person writes out his or her signature several times, one immediately after another." *Id.* at p. 67.  The Attorney General's Office also informed local election officers in advance of the 2016 general election that "[m]oderators should be aware that a person's signature often varies depending on the circumstances, and it is often hard to tell whether two signatures were written by the same person."  *See Exhibit A*, Oct. 31, 2016 A.G. Memo. at p. 4. The result of this lack of meaningful procedures is that the use of RSA § 659:50(III) varies widely by municipality.  And even if standard procedures could be adequately formulated— which is unlikely—the process would be inherently fallible and inconsistent given that it would involve human reviewers.

25.     RSA § 659:50(III) particularly has a disenfranchising effect on legitimate voters who, like legally blind Plaintiff Mary Saucedo, are seniors and individuals with disabilities. Seniors and individuals with disabilities are far more likely to have poor handwriting, signatures that have changed, or to be unable to sign the same way twice.  Moreover, seniors and individuals with disabilities are far more likely to need the assistance of someone to sign their name—an event that could cause the voter to be disenfranchised under RSA § 659:50(III) because the signatures would "appear" to be executed by different persons.

## III.     RSA § 659:50(III)'s Violation of the Constitution and the ADA

26.     RSA § 659:50(III) is subject to strict scrutiny, as it places a severe burden on Plaintiffs' fundamental right to vote, and disenfranchises hundreds of voters each election cycle who must vote by absentee ballot.  These voters are never told that they have been disenfranchised, nor are they given an opportunity to cure the alleged disparity in signatures. Even after the election, unless they access the Secretary of State's website, they will simply never know that they have been disenfranchised.

27.     Complete deprivation of the constitutional right to vote, without notice or an opportunity to cure a perceived signature mismatch, and without an opportunity to appeal from the moderator's determination, constitutes a severe burden on the right to vote, especially when it implicates people who are seniors and individuals with disabilities.

28.     This unnecessary law further functions to unlawfully discriminate against and screen out individuals with disabilities.  Indeed, at least two voters at the Laconia Rehabilitation Center, an assisted living facility, were disenfranchised due to "signature mismatch," which is especially meaningful given that the Senate District 7 race—which covers Laconia—was decided by only 17 votes.  This race was subject to a recount and, during the recount, the Secretary of State took the position that he did not have the authority to overturn the moderator's decision to reject these ballots due to "signature mismatch."

29.     There is no legitimate government interest—let alone a compelling one—to disenfranchise individuals due to a perceived signature mismatch without providing any notice and opportunity to cure a perceived signature mismatch.

30.     There is no basis for upholding RSA § 659:50(III) as a means to prevent voter fraud.  In response to a Right-to-Know request filed by the ACLU-NH, the State has provided no evidence that a significant number of the absentee ballots rejected by moderators due to signature "mismatch" from 1979 to 2016—such as the 321 rejected votes in 2012 or the 145 rejected votes in 2014—were the result of voter impersonation.  Rather, of the approximately half-million absentee ballots cast during general elections since 1996, the State identified only two verified cases of voter impersonation by absentee ballot.  And it appears that these two incidents were detected through mechanisms other than New Hampshire's "signature mismatch" regime.

31.     Innocent factors are far more likely to cause a perceived signature mismatch than

unlawfulness.  These include mechanical factors—such as pen type, the writing surface, and the ink used.  They include physical factors—such as body position, general poor handwriting, age, illness, injury, medicine, or eyesight.  They include disability—a status protected by federal civil rights law. They also include circumstances and factors—such as voters' distress, anger, fear, depression, happiness, or nervousness.

32.   Further, the State's interest is only in preventing someone from signing an absentee ballot in the name of a voter <u>fraudulently and without their consent</u>.   But RSA § 659:50(III) effectively requires that a vote of a senior or individual with disability be cast aside when that person has <u>voluntarily</u> secured the help of another person to sign on their behalf because of their age or disability.  Thus, RSA § 659:50(III) disenfranchises legitimate voters who are seniors and individuals with disabilities and who require assistance to vote as permitted under RSA § 657:7(II)(b).   Indeed, it may be the disability itself that causes the voter to vote by absentee ballot in the first place.

33.   Even if the "matching signatures" requirement served a real purpose—which it does not—RSA § 659:50(III) would still be unconstitutional.   New Hampshire's regime unlawfully disenfranchises voters because it (i) provides no notice to these mismatched-signature voters that they will be or have been disfranchised and (ii) provides no opportunity to cure or to appeal from a moderator's determination.

## CLAIMS FOR RELIEF

**Count I**
**(Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS)**
**(On Behalf of all Plaintiffs)**

34.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

35.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of … liberty … without due process of law."  This due process principle protects the fundamental right to vote.

36.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

37.     Plaintiffs are registered voters in New Hampshire who attempted to vote by absentee ballot during the 2016 general election.

38.     Plaintiffs were deprived of their right to vote by having their absentee ballots rejected pursuant to RSA § 659:50(III) without notice, without an opportunity cure, and without any meaningful appeal.

39.     As a result of RSA § 659:50(III), Plaintiffs and other voters have suffered and will continue to suffer irreparable harm—namely disenfranchisement.  If there is no change in the status quo, Plaintiffs believe that their votes by absentee ballot will not be counted in future elections.

40.     Unless restrained from doing so, the State will continue to violate the Fourteenth Amendment by enforcing RSA § 659:50(III).  Unless enjoined, the State's continued enforcement of this statute will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

41.     Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

**Count II**
**(Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983 –**
**FUNDAMENTAL RIGHT TO VOTE)**
**(On Behalf of all Plaintiffs)**

42.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

43.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law."  This due process principle protects the fundamental right to vote.  If a regulation imposes a severe burden on the right to vote, it must be narrowly drawn to advance a state interest of compelling importance.  *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

44.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

45.     Plaintiffs are registered voters in New Hampshire who attempted to vote by absentee ballot during the 2016 general election.

46.     However, Plaintiffs were deprived of their right to vote—a burden which is undoubtedly severe—by having their absentee ballots rejected pursuant to RSA § 659:50(III).

47.     RSA § 659:50(III) violates the Fourteenth Amendment's due process protections because it inhibits Plaintiffs and similarly-situated citizens from exercising their constitutional right to vote.  It does so without notice, without an opportunity cure, and without any meaningful appeal.

48.     As a result of RSA § 659:50(III), Plaintiffs and other voters have suffered and will continue to suffer irreparable harm—namely disenfranchisement.  If there is no change in

the status quo, Plaintiffs believe that their votes by absentee ballot will not be counted in future elections.

49.     Unless restrained from doing so, the State will continue to violate the Fourteenth Amendment by enforcing RSA § 659:50(III).   Unless enjoined, the State's continued enforcement of this statute will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

50.     Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

## Count III
### (Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983 – EQUAL PROTECTION)
### (On Behalf of all Plaintiffs)

51.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

52.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person within its jurisdiction the equal protection of the laws."

53.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

54.     Plaintiffs are registered voters in New Hampshire who attempted to vote by absentee ballot during the 2016 general election.

55.     Plaintiffs were deprived of their right to vote by having their absentee ballots rejected pursuant to RSA § 659:50(III).

56.     RSA § 659:50(III) violates the Fourteenth Amendment's equal protection provisions because there is no formalized statewide procedure or standard for moderators to

evaluate whether an absentee ballot envelope signature matches the signature used to apply for the absentee ballot. The result is that the use of RSA § 659:50(III) is not uniform. Where identical disparities may exist concerning a signature on an absentee ballot envelope and a signature on an absentee ballot application, an absentee ballot may be counted in one jurisdiction while being rejected in another. This leads to arbitrary results where there is greater likelihood in some places that one's vote will not be counted on the same terms as the vote of someone in another location. *See Bush v. Gore*, 531 U.S. 98 (2000) (voting recount violated equal protection where Florida had not shown that its recount procedures include the necessary safeguards, thus allowing for arbitrary results).

57.    As a result of RSA § 659:50(III), Plaintiffs and other voters have suffered and will continue to suffer irreparable harm—namely disenfranchisement. If there is no change in the status quo, Plaintiffs have no confidence that their votes by absentee ballot will be counted in future elections while the votes of others similarly situated may be counted.

58.    Unless restrained from doing so, the State will continue to violate the Fourteenth Amendment by enforcing RSA § 659:50(III). Unless enjoined, the State's continued enforcement of this statute will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

59.    Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

**Count IV**
**(Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213)**
**(On Behalf of Plaintiff Mary Saucedo)**

60.    Plaintiff Mary Saucedo realleges and incorporates by reference the allegations contained in the preceding paragraphs.

61.     The Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, guarantees qualified individuals an equal opportunity to access the benefits of the services, programs, or activities of a public entity.  42 U.S.C. § 12132.

62.     Title II of the ADA mandates, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

63.     In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others.  28 C.F.R. § 35.130(b)(1)(ii)-(iii).

64.     A public entity may not "utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(3)(i).  Nor may a public entity "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

65.     Furthermore, such public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and

enjoy the benefits of, a service, program, or activity of a public entity."   28 C.F.R. § 35.160(b)(1).  A public entity must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7)(i).

66.     The Office of the New Hampshire Secretary of State, as an agency or instrumentality of the State of New Hampshire, is a public entity under Title II of the ADA.

67.     The administration of election and voting, including absentee voting and the counting of votes, is a service, program, or activity provided by the Defendants New Hampshire Secretary of State and the New Hampshire Secretary of State's Office.

68.     Plaintiff Mary Saucedo is a registered voter in New Hampshire who attempted to vote by absentee ballot during the 2016 general election.

69.     Plaintiff Mary Saucedo is an individual with a disability under the ADA and an eligible voter under New Hampshire law.  Thus, she is a qualified individual with a disability entitled to the protections of the ADA in accessing the State's service, program, or activity of absentee voting.

70.     Plaintiff Mary Saucedo was deprived of her right to vote by having her absentee ballot rejected pursuant to RSA § 659:50(III).

71.     In enforcing RSA § 659:50(III), the State is failing to meet its obligations to voters who are disabled and cannot vote in person with an opportunity to vote that is equal and equally effective to the opportunity provided to others.  Rather, through its system of rejecting and refusing to count absentee ballots perceived to have mismatched signatures, wholesale and without safeguards for qualified individuals with disabilities, the State is employing criteria and

methods of administration that discriminate against, exclude, and screen out individuals with disabilities in violation of the ADA.

72.     Indeed, in enforcing RSA § 659:50(III), the State is failing to implement a readily available, accessible absentee voting system for individuals with disabilities and is failing to make the reasonable modifications necessary to allow Plaintiff Mary Saucedo and other disabled individuals to vote equally.  The State has excluded Plaintiff Mary Saucedo from participation in, and denied her the benefits of or otherwise discriminated against her in its service, program, or activity of absentee voting.

73.     Accordingly, RSA § 659:50(III) violates Title II of the ADA because it discriminates against individuals with disabilities by denying Plaintiff Mary Saucedo and other disabled voters an equal and equally effective opportunity to participate in the political process.

74.     As a result of RSA § 659:50(III), Plaintiff Mary Saucedo and other disabled voters have suffered and will continue to suffer irreparable harm—namely discrimination and unequal access to the franchise through the absentee ballot voting process.  If there is no change in the status quo, Plaintiff Mary Saucedo has no confidence that her vote by absentee ballot will be counted in future elections.

75.     The State's continued enforcement of RSA § 659:50(III) fails to meet the State's obligations to provide disabled voters with an equal opportunity to vote by absentee ballot and constitutes an ongoing and continuous violation of the ADA and its supporting regulations. Unless restrained from doing so, the State will continue to violate the ADA by enforcing RSA § 659:50(III).  Unless enjoined, the State's continued enforcement of this statute will continue to inflict injuries for which Plaintiff Mary Saucedo has no adequate remedy at law.

76. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

77. Plaintiff Mary Saucedo is entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a) Declare the portion of RSA § 659:50(III) stating that "The signature on the affidavit appears to be executed by the same person who signed the application" unconstitutional in derogation of the Fourteenth Amendment to the United States Constitution and unlawful under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213;

b) Temporarily, preliminarily, and permanently restrain and enjoin the State of New Hampshire from enforcing the provision of RSA § 659:50(III);

c) Have Plaintiffs absentee ballots counted for the 2016 general election;

d) Award Plaintiffs attorneys' fees in this action pursuant to 42. U.S.C. § 1988(b);

e) Award Plaintiffs their costs of suit; and

f) Grant such other and further relief as this Court deems just and proper in the circumstances.

Respectfully submitted,

MARY SAUCEDO,
MAUREEN P. HEARD, and
THOMAS FITZPATRICK, D.B.A.

By and through their attorneys affiliated with the
American Civil Liberties Union of New Hampshire
Foundation and the American Civil Liberties Union
Foundation,


*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH  03301
Tel.:  603.224.5591
gilles@aclu-nh.org

Paul Twomey (N.H. Bar No. 2589)
44 Ring Road
Chichester, NH  03258
Tel.: 603.568.3254
paultwomey@comcast.net

Dale E. Ho**
Julie A. Ebenstein**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2686
dho@aclu.org
jebenstein@aclu.org
** *pro hac vice* application pending

23

Susan Mizner**
Claudia Center**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA  94111
Tel.: 415.343.0781
smizner@aclu.org
ccenter@aclu.org
** *pro hac vice* application pending

Dated:   May 10, 2017