# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

_____

|   |   |   |
|---|---|---|
| MARY SAUCEDO, | ) | |
| MAUREEN P. HEARD, and | ) | |
| THOMAS FITZPATRICK, D.B.A. | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Case. No. 1:17-cv-183-LM |
| | ) | |
| WILLIAM M. GARDNER, Secretary of | ) | |
| State of the State of New Hampshire, in his | ) | |
| official capacity, and THE SECRETARY | ) | |
| OF STATE'S OFFICE OF THE STATE | ) | |
| OF NEW HAMPSHIRE, | ) | |
| | ) | |
|     Defendants. | ) | |

_____

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Each election, hundreds of qualified absentee voters are disenfranchised under New Hampshire's signature-match statute without notice or an opportunity to cure.  Many are disabled and elderly individuals who are unable to produce consistent signatures.  Many have ordinary variations in their signature styles.  Even one disenfranchised voter—let alone hundreds—is too many.  Yet up to 275 voters, including Plaintiffs, were disenfranchised during the November 2016 general election pursuant to New Hampshire Rev. Stat. Ann. ("RSA") 659:50(III).

Defendants do not dispute that Plaintiffs are U.S. citizens, New Hampshire domiciliaries, and qualified, registered voters who intend to vote absentee in the future.  The parties agree that Plaintiffs were entitled to vote by absentee ballot in the 2016 presidential election, had properly

cast their ballots, and believed their votes were counted.  The parties also agree that Plaintiffs'

ballots were rejected pursuant to RSA 659:50(III) due to a perceived signature mismatch,

without notifying Plaintiffs or providing them with an opportunity to cure the perceived

mismatch, resulting in Plaintiffs' disenfranchisement.  Yet Defendants refuse to admit that

Plaintiffs, and other absentee voters whose ballots were rejected pursuant to the challenged

statute, were disenfranchised in error.  Instead, Defendants defend their rejection of signature

mismatch ballots without providing voters with due process, and seek to treat Plaintiffs' and

other absentee voters' disenfranchisement as a valid and constitutionally permissible "variance"

in election returns.  Defs.' Mem. in Supp. of Summ. J., Doc. No. 54 ("Defs.' Mem."), at 23.

Plaintiffs disagree that the State's denial of their right to vote should be viewed as an acceptable

variance.

    Plainly put, RSA 659:50(III) violates Plaintiffs' constitutional rights to due process

because it provides neither notice nor process of any kind to voters before they are

disenfranchised for a perceived signature mismatch.  In light of the severity of the burden present

here—namely, disenfranchisement—and Defendants' failure to put forth an adequate

justification for the signature match process, RSA 659:50(III) also violates the Equal Protection

Clause.  And RSA 659:50(III) also denies Plaintiffs equal protection because the statute is not

being—and cannot be—uniformly and consistently applied in New Hampshire.  Furthermore,

RSA 659:50(III), even as amended in 2017, unlawfully screens out voters protected by the

Americans with Disabilities Act ("ADA"), including Plaintiff Mary Saucedo, who has a

disability that impairs her ability to write legibly or consistently.  For these reasons and the

reasons below, RSA 659:50(III) violates the Fourteenth Amendment to the U. S. Constitution

and Title II of the ADA.

**OBJECTIONS TO DEFENDANTS' STATEMENT OF FACTS**

Plaintiffs oppose the facts and conclusory statements in Defendants' Memorandum in Support of Summary Judgment which rely on: (1) affidavits from five witnesses whom Defendants did not properly disclose, *see* Defs.' Mem. at 8-11; Defs.' Exs. 13-17, Doc. Nos. 54-13, 54-14, 54-15, 54-16, and 54-17; (2) Defendants' Exhibit 6 concerning the attendance of moderators at trainings prior to the 2016 general election, *see* Defs.' Mem. at 7-8; Attendance List and Rejections, Doc. No. 54-6; and (3) new affidavit testimony from Deputy Secretary of State David Scanlan, *see* Scanlan Aff., Doc. 54-1, ¶¶ 10-14.  For the reasons set forth in Plaintiffs' Motion to Strike, these materials should not be considered by the Court because Plaintiffs have had no fair opportunity to probe the provenance, veracity, and credibility of this new evidence.  Pls.' Mot. to Strike, Doc. No. 56 ("Pls.' Mot. to Strike").  Even were the Court to consider them, however, none substantiate any fact that "might affect the outcome of the suit under the governing law."  *United States v. One Parcel of Real Prop. with Bldgs*., 960 F.2d 200, 204 (1st Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Based on the record, with or without Defendants' new evidence, Plaintiffs are entitled to judgment.  Plaintiffs respond specifically as follows:

*Scanlan Affidavit*:  Citing Deputy Scanlan's affidavit and Exhibit 6, Defendants attempt to link moderators' attendance at the Secretary of State's Office's voluntary training to lower absentee ballot rejection rates in the moderators' polling place.  *See* Defs.' Mem. at 32.  This material should not be considered.[1]  But even if it were considered, it does not suggest that a

---

[1] Plaintiffs have moved this Court to Strike Exhibit 6 to Defendants' summary judgment motion, and ¶¶10-14 of Deputy Scanlan's affidavit testimony, because (1) the training attendance document attached as Exhibit 6 was not previously disclosed to Plaintiffs; (2) under the "sham affidavit" doctrine Deputy Scanlan's affidavit testimony conflicts with his Rule 30(b)(6)

moderator's attendance at the trainings offered by Defendants in 2016 has any correlation—let alone a causal link—to mismatch rejection rates that occurred during the 2016 general election. This is for several reasons.

*First*, the training document indicates that multiple towns and wards with high and disproportionate signature mismatch rejection rates, relative to the average statewide rejection rate, had moderators who *did* attend the State's training. These include two of the eight polling places (Hampton Falls and Manchester Ward 4) with rejection rates above 2% (relative to all absentee ballots cast at those polling places), as Mr. Scanlan's affidavit concedes at paragraph 12. Additional examples include: Manchester's Ward 2, where Plaintiff Mary Saucedo resides with 8 signature mismatches or a 1.56% rejection rate; Hudson with 19 signature mismatches or a 1.68% rejection rate; Bedford with 25 signature mismatches or a 0.88% rejection rate; and Windham with 11 signature mismatches or a 0.96% rejection rate. *See* Pls.' Mot. to Strike at 15, n.13. Indeed, based on Defendants' Exhibit 6, most signature mismatch rejections during the 2016 general election (191 out of 275, or 69%) came from towns and wards where the moderator did attend the trainings.

*Second*, the trainings provided a general election law review and, with respect to signature matching, did no more than recite the standard in the Election Procedure Manual. *See* Scanlan Dep., Doc. No. 49-3, at 76:7-20; 78:8-11. There is no reason to believe that moderators who failed to attend the trainings prior to the 2016 election were any more or less aware of the

---

deposition testimony and his testimony as a purported expert; (3) these paragraphs constitute a supplemental expert disclosure that Defendants did not timely produce before the December 18, 2017 deadline or the March 8, 2018 close of discovery; and (4) Deputy Scanlan is not qualified to render an expert opinion on whether a moderator's presence at a training had a causal impact on signature mismatch rejection rates. *See* Pls.' Mot. to Strike at 15-24.

standard stated in the Election Procedure Manual, or that moderator attendance or nonattendance altered their rate of signature mismatch rejections.

Defendants' contrary conclusion is based on a meaningless calculation. Deputy Scanlan testified that in the 163 towns and wards where moderators attended the training in the lead up to the 2016 general election "[t]he rate of rejection equals 1.17 rejections per town" (191 rejections), while the remaining 31 towns and wards whose moderators did not attend the training "had a rate of 2.71 rejections per town" (84 ballots). Scanlan Aff., Doc. No. 54-1, ¶¶ 13-14. To reach these figures, Deputy Scanlan took the number of *all* ballots rejected in training-attending towns then divided it by the number of towns. He did the same for the ballots rejected in non-training-attending towns. This is not the applicable rejection rate, as there is no consideration of the numbers, in each town, of total absentee ballots cast and ballots rejected based on signature mismatch, thereby masking the disparities in rejection rates among towns.[2] And recall that 74% of towns did not reject any ballots for signature mismatch in 2016. Pls.' Mem. at 32-33.

*Moderators' Affidavits*: Plaintiffs also moved to strike affidavits from five current or former moderators or election clerks whom Defendants did not properly disclosed under Rule 26(a)(1)(A)(i), or over the course of discovery. *See* Pls.' Mot. to Strike at 2-13.[3] But even if the Court considers these affidavits, they are unpersuasive. Defendants characterize the "affidavits from several election officials" to "represent[] a cross-section of the towns and cities

---

[2] The "simple math" that Deputy Scanlan performed is methodologically unsound. Defs' Opp'n to Pls.' Mot. to. Strike, Doc. No. 58, at 11-13.

[3] On April 23, 2018, following receipt of Defendants' motion and the affidavits, Plaintiffs requested that Defendants immediately produce all communications with the clerks and moderators Defendants contacted "concerning the signature mismatch statute and/or this case," as responsive to Plaintiffs' discovery requests. Pls.' Mot. to Strike at 9. On April 26, 2018, Defendants instead produced a privilege log, citing work product privilege. *Id.* at 9-10.

within the State of New Hampshire," and "provide a snapshot of how cities and towns actually implement RSA 659:50." Defs.' Mem. at 8. But this ignores that Defendants self-selected "cross-section" of moderators, present a curated "snapshot" of local practices. For example, Defendants did not offer any statements from moderators in the 237 polling places who did not disenfranchise any voters due to perceived signature mismatches. Thus, the Court should not credit Defendants' conclusory statements that the standard articulated by Defendants for rejecting ballots pursuant to RSA 659:50(III) is "well understood" by moderators, *id.* at 10-11, or is "universally relied upon by moderators," *see id.* at 28-29.[4] Moreover, while Defendants cite the moderators' affidavits for the proposition that requiring moderators to seek out and verify the identity of absentee voters on election day would be "extremely burdensome," *id.* at 20, the moderator testimony on the manageable numbers of ballots rejected for signature mismatches does not support this argument.[5]

### ARGUMENT

### I.    RSA 659:50 Violates Federal Constitutional Protection for Procedural Due Process

The parties agree that this Court must weigh the three factors set forth in *Mathews v. Eldridge* to determine whether Defendants' signature mismatch rejection process provides due process to absentee voters: (1) Plaintiffs' interest in the fundamental right to vote, including the

---

[4] This testimony contradicts the State's assertion that disparately high rates of rejections under the signature-mismatch statute can be explained away by moderators' lack of presence at trainings. If the standard under RSA 659:50(III) is "well understood" by moderators, then moderators' presence at the trainings is irrelevant.

[5] Defendants protest the burden on moderators were they were to be required to "seek out and verify the identity of <u>hundreds</u> of absentee voters"; however, the moderators offering affidavit testimony would each only need to verify the identity of *two to six voters* whose ballots they testify they rejected pursuant to RSA 659:50(III). *See* Pillotte Aff., Doc. No. 54-13, ¶ 8; Fowler Aff., Doc. No. 54-14, ¶ 5; Saur Aff., Doc. No. 54-15, ¶ 6; Todd Aff, Doc. No. 54-16, ¶ 15.

right to have their vote counted; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See* Pls.' Mem. at 26-27; Defs.' Mem. at 17; *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, *7-9 (N.D. Ill. Mar. 13, 2006) (stating *Mathews* elements), *vacated as moot*, 536 F.3d 788 (7th Cir. 2008).  Moreover, as explained in Section IV *infra*, if the statute fails under this three-part test, then it also fails under the "no set of circumstances" test in *United States v. Salerno*, 481 U.S. 739 (1987).

### A.  Plaintiffs' Legally Protected Interest in the Right to Vote Is Weighty.

The parties agree that Plaintiffs have a fundamental right to vote, and a legally protected interest in having their vote counted.  Pls.' Mem. at 27; Defs.' Mem. at 17.  Pre-deprivation process is critical to adequate due process, particularly when the protected interest is the right to vote, which, once denied, cannot be recovered after the election.  *See* Pls.' Mem. at 36; *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (reiterating that "[a] fundamental requirement of due process is the 'opportunity to be heard,'" and that "[i]t is an opportunity which must be granted at a meaningful time and in a meaningful manner." (internal citation omitted)).  The remaining *Mathews* factors ask whether New Hampshire's process for disenfranchising Plaintiffs was constitutionally adequate, in light of the fundamental nature of the right at issue and the irreversibility of elections officials' ballot rejection.

Defendants, however, misapply the *Mathews* standard.  Having conceded that Plaintiffs have a "significant interest in voting," Defendants contend that the Court should simply weigh the remaining two factors: the risk of erroneous deprivation (factor two) against the burdens that providing additional process would impose on the state (factor three).  *See* Defs.' Mem. at 17

7

("Defendants do not dispute that Plaintiffs have a significant interest in voting.  Therefore this case turns on whether the risk of erroneous deprivation under the current procedures outweighs the burdens that would be imposed on the State to require the types of additional procedures Plaintiffs request.").  But Defendants are incorrect that once the first factor is satisfied in favor of Plaintiffs it simply drops out of the balance.  The nature of the potential deprivation remains "a factor to be considered in assessing the validity of any administrative decision making process." *Mathews*, 424 U.S. at 341.  This is particularly the case where, as here, the interest at stake, once denied, cannot be remedied post-election.[6]

**B.  RSA 659:50 Creates a Substantial Risk of Erroneously Depriving Plaintiffs, And Other Absentee Voters, of Their Right to Vote.**

*a.  The Number of Ballots Rejected for Signature Mismatch Is Undisputed.*

There is no genuine dispute that up to 275 ballots, which is 0.35% of the absentee ballots submitted in 2016, were rejected due to a signature mismatches in 2016.  *See* Pls.' Mem. at 2, 22.[7]  Defs.' Interrog. No. 16 Resp., Doc. No. 49-1; *see also* Defs.' Mem. at 12, 14.[8]

---

[6] Thus in *Mathews*, the Supreme Court distinguished between the due process required for deprivation of a disability insurance benefit compared to a welfare benefit based on differences in the interest at stake (the first factor).  *Mathews v. Eldridge*, 424 U.S. 319, 340-43 (1976).  In a prior case *Goldberg v. Kelly*, 397 U.S. 254 (1970), a pre-deprivation hearing was required for welfare benefits because of the critical interest in ongoing subsistence income for "persons on the very margin of subsistence."  *Mathews*, 424 U.S. at 340.  But in *Mathews* the outcome was different for a disability insurance benefit because errors could be addressed post-deprivation and pre-deprivation process was less necessary.  *Id.* at 340-41.  Here, of course, "[o]nce rejected, the ballot cannot be rehabilitated and cast after a post-deprivation hearing.  The voter's right to vote [has been] irremediably denied."  *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646at *9 (N.D. Ill. Mar. 13, 2006).

[7] *See* Pls.' Mem. at 2, n.2.  This 275 figure combines the 237 rejections that were coded by municipal clerks as "Affidavit Signature Does Not Match Request" (ASDMR) and 38 rejections that were coded by municipal clerks as "Invalid Signature on Application for Absentee Ballot" (ISA).

Nevertheless, Defendants dramatically understate the ballot rejection rate, and therefore the risk

of erroneous deprivation of voters' right to vote, by "screen[ing] out" 94 ballots from voters who

they claim "failed to follow instructions by signing the forms in mismatched styles."  Defs.'

Mem. at 13-14.  Regardless of how one characterizes the signature "styles" used by those

voters—which a moderator is not trained to evaluate —what is not disputed is the fact that these

94 voters were disenfranchised under the challenged statute without process or an ability to cure.

The State does contend that the 94 voters were not qualified to vote.  Defendants' claim that "the

number of ballots that were rejected under the signature match regime is actually no higher than

151" (which is 0.19% of the absentee ballots submitted in 2016), is not supported by the record

and should be rejected.  Defs.' Mem. at 13-14

> ### b.  *A Rejection Based on Different Signature Styles by the Same Voter Is an Unlawful Deprivation Caused by the Challenged Scheme.*

That some voters may have, based on the subjective view of the moderator, used a

different signature style in 2016 is not relevant to the risk of erroneous deprivation resulting from

RSA 659:50.[9]  State elections laws do not require the voter to use the same signature style, and

"stylistically similar" signatures do not relate to a voter's qualification or eligibility to vote.  *See*

Defs.' Mem at 13.[10]  A voter is required to place the ballot into an affidavit envelope, sign it, and

---

[8] Defendants contend 245 ballots is the accurate figure, after subtracting the 30 ballots rejected for reasons Defendants claim moderators misclassified as a signature mismatch from the 275 total, which is 0.31% of the absentee ballots submitted in 2016.

[9] These rejections can amount to disenfranchising a voter because a few letters in one of their signatures is not legible to the moderator.  For example, Gloria Pillotte, the moderator of Manchester Ward 9, rejected a ballot because on the absentee ballot application "only some of the individual letters of the signature were legible but most were not" and "[she] could read each letter of the signature on the affidavit envelope . . . [t]he signatures did not appear to be stylistically similar at all."  Defs.' Mem. at 13.

[10] Moreover, using a varied signature style to sign the ballot envelope affidavit is distinguishable from neglecting to sign the ballot envelope entirely.  The relevant statute requires that the voter

return it to the town in which the voter is domiciled.  *See* Defs.' Mem. at 5.  Voters must mark their vote by "filling in the appropriate oval and voting no more than the number of votes permitted for each office," for a clerk to discern who they voted for and count their vote.  Defs.' Mem. at 5.  With their signature on the absentee ballot application, voters certify "under penalty of voting fraud" their qualification to voter absentee.  *See* Absentee Ballot Instructions, Doc. No. 54-8.  With their signature on the affidavit envelope, the voter confirms that they marked the ballot (with or without assistance).  *See* Envelope Affidavit, Doc. No. 54-7.  After the voter signs and submits their ballot envelope, having complied with these requirements, the matter is literally out of the voter's hands.[11]

Moderators then exercise complete discretion to reject absentee ballots based on their subjective determination that a voter's affidavit envelope signature "appears" to be from a person who did not sign the application.  RSA 659:50 (III).  These determinations by moderators, untrained in handwriting analysis and prone to error, *see* Pls.' Mem. at 31-32, do not meet constitutional standards.

### c.  The Risk of Deprivation is Not Cured by SB248.

Defendants make much of the 2017 statutory amendment to RSA 659:50 (2017) [SB248] which require Defendants to include notice that signatures will be matched in the absentee ballot application form and on the affidavit envelope, and exempt from the signature match

---

"execute the affidavit on the envelope," RSA 657:17, and noncompliance arguably implicates the voter's certification that she or he is qualified to vote absentee, and (with or without assistance) marked the ballot.

[11] States may set voting requirements, but it does not follow that they can disenfranchise voters who satisfy those requirements. *See also Ayers-Schaffner v. DiStefano*, 37 F. 3d 726, 729, n.8 (1st Cir. 1994) ("It is, of course, well established that states may restrict the voting privilege through residency and other registration requirements.  The crucial distinction here is that the plaintiffs have satisfied the state's standard voting requirements.").

requirement disabled voters who certify that they received assistance signing their ballot.  Based

on the amendment, Defendants ask the Court to assume that "in upcoming elections the risk of

ballot rejection for signature mismatch will be significantly lower than 0.19%."  Defs.' Mem. at

4, 22.  This conclusion is unsupported by evidence, however, and the amendments do not

transform the law to satisfy constitutional due process requirements.

*First*, informing voters of the RSA 659:50(III) process is insufficient to satisfy the due

process requirements because the constitutional concern is the fact that a voter is given no notice

when their signatures are deemed to mismatch.  *See La Follette v. Padilla*, No. CPF-17-515931

1, 5-6 (Cal. Super. Ct. Mar. 5, 2018) (holding that a written notice informing the voter to sign in

his or her own handwriting is insufficient because the constitutional concern is the fact that a

voter is given no notice when their signatures are deemed to mismatch)*; Raetzal v.*

*Parks/Bellemont Absentee Election Bd.*, 762 F.Supp. 1354, 1357 (D. Ariz. 1990) (holding that

the state's absentee ballot challenge procedure which did not provide any direct notice to the

individual voter violated due process); *see also Collins v. Marina-Martinez*, 894 F.2d 474, 481

(1st. Cir. 1990) ("Absent suitable notice, the 'opportunity' for plaintiff to be heard was a

charade.").  And even individualized pre-deprivation notice must inform the deprived person

about the means for contesting the deprivation, information that the amendment does not require

here.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14-15 (1978); *id.* at 14, n.15. [12]

---

[12] Defendants ask the Court to focus on the "entire absentee voting scheme," instead of the lack
of due process after the voter casts his or her ballot and she is disenfranchised.  *See* Defs.' Mem.
at 16.  The First Circuit rejected a similar argument in *Ayers-Schaffner v. DiStefano*, 37 F. 3d
726, 728 (1st Cir. 1994) (participation in a curative election to voters who had voted in the
original, defective election); *id.* at 728 ("[A] flaw is found in the Board's suggestion that the
burden imposed by its action is slight because plaintiffs had ample opportunity to vote in the first
election.  This is tantamount to a claim that plaintiffs waived their right to vote in the second
election by failing to vote in the first. However characterized, the contention is wholly without

*Second*, there is no evidence that inclusion of the new notice language will prompt absentee voters to sign more consistently or result in moderators rejecting ballots with less frequency. Contrary to Defendants' suggestion, Dr. Mohammed's testimony does not support Defendants' argument that including notices will decrease the instances of erroneous disenfranchisement. Defs.' Mem. at 4-5. He did not testify that people typically use one consistent signature style when executing an important document, or that there is less variation among signers' "more formal" signatures, as Defendants claim. Mohammed Dep., Doc. No. 54-11, at 44-45. Dr. Mohammed explained that a signer who knows the signature will be used for comparison, may tend to make the signature a bit more formal, for example, write their full name "Jonathon," instead of their normal use of "John." *Id.* at 50:8-18. He observed that if people make a "conscious effort" in signing documents, the effect is that they use more pen pressure, which is observable under a microscope. *Id.* at 48:25-49:6. Dr. Mohammed explicitly stated that a more formal signature does *not* imply more consistency. *Id.* at 48:7-12. Thus, there is no evidence that the new notice will make signatures more uniform or effect moderators' signature mismatch determinations.[13] Defendants' predictions of the amendment's future effects are not supported by the record.

---

force."); *see Zessar v. Helander*, 2006 WL 642646, *1 (N.D. Ill. 2006) (finding liability where plaintiff did not have notice or an opportunity for a hearing before the official canvass); *vacated as moot, Zessar v. Keith*, 536 F.3d 788, 792 (7th Cir. 2008)). How to remedy the violation is a separate matter.

[13] Defendants contend that disabled voters are exempt from the requirement. But, as the legislature noted during the hearings on the bill, SB248 "fails to address voters whose signatures are mismatched due to a disability and do not require or can't obtain assistance from another person." *See* Pls.' Mem. at 25; Senate Bill 248 Legislative History Part 2, Doc. No. 49-11, at SAU385-86, 410-11, 420-21. Disabled absentee voters who execute their voter documents themselves remain subject to the signature match requirement, and vulnerable to disenfranchisement based on disability. *See* Pls.' Mem. at 23-26.

### d. *The Rate of Ballot Rejections Here Does Not Exempt the State from Providing Voters with Due Process Before Rejecting their Ballot.*

Defendants characterize New Hampshire's signature mismatch rejection rate as "extremely low" without indicating the basis for that conclusion, or identifying their comparator. Defs.' Mem. at 12.[14]   The approximately 275 voters disenfranchised under this statute surely would take little comfort in this characterization.

This argument was recently rejected by a California court when striking down that state's signature-mismatch regime. *La Follette v. Padilla*, No. CPF-17-515931, at 5 (Cal. Super. Ct. Mar. 5, 2018), Doc. No. 49-4.   Indeed, often courts have found that ballot rejection numbers and rates comparable to those at issue in this case create an unacceptable risk of erroneous disenfranchisement for purposes of due process liability.  *See Ne. Ohio Coal. for the Homeless v. Husted ("Husted")*, 696 F.3d 580, 593, 597 (6th Cir. 2012) (holding that rejecting thousands of provisional ballots cast at the right polling location but wrong precinct constituted a "substantial" burden on provisional voters, even though such ballots historically constituted less than 0.248% of all votes cast); *Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. 2006) (finding that while the risk of erroneous deprivation was "not enormous," because only about 1,100 out of 191,177 absentee ballots were not counted but, "the probable value of an additional [pre-deprivation] procedure is likewise great in that it serves to protect the fundamental right to vote."); *see also One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 903 (W.D. Wis. 2016) (finding a severe burden where about 100 otherwise qualified voters were disenfranchised by Wisconsin's voter ID law.  Plaintiffs have demonstrated that the risk of erroneous deprivation is significant

---

[14] According to Defendants' own testimony, a signature-mismatch rate in excess of 1% relative to all absentee ballots cast would be unacceptable.  Scanlan Dep., Doc. No. 49-3, at 197:1-198:1; *see* Pls' Mem. at 34.  The signature match rejection rate in several towns and wards is well above 1%.  Pls.' Mem. at 33-34.

and systemic.

There is no threshold rate below which the State may refuse to provide due process protection, particularly when the disenfranchisement is systemic. *See Black v. McGuffage*, 209 F. Supp. 2d 889, 901 (N.D. Ill. 2002) (noting that plaintiffs did not "seek to mandate a certain level of accuracy," but rather challenged a system that allowed for significant inaccuracy in the counting of the votes of "some portions of the electorate and not others without any rational basis" without the availability of redress; and finding that what "Plaintiffs allege is not a question of mistakes or irregularities which can be addressed by an adequate state corrective procedure, but rather it is the state procedure itself which is alleged to cause a fundamental unfairness."). Plaintiffs in this case challenge the signature match requirement because it mandates the secret, incurable rejection of a properly-cast ballot, resulting in the complete denial of Plaintiffs' right to vote without a means of redress, not because it imposes a particular rejection rate.

Defendants are misguided in comparing the signature mismatch rejection rate to the number of votes changed in 2016 after the Secretary of State's office performed hand recounts for 15 races.[15]  Defendants claim that a total of 567 votes were changed, or approximately 0.24% of the total number of votes that were originally reported on election night.  Defs.' Mem. at 15.[16] Votes changed after a recount is not comparable to the risk of erroneous disenfranchisement posed by RSA 659:50.  As Defendants acknowledge, the change after a hand count simply shows that automated counting machines are, in some circumstances, "not as good at determining the

---

[15] Defendants' brief says fourteen recounts occurred in 2016.  Defs.' Mem. at 14.  Fifteen are listed in a document produced to Plaintiffs.  Recounts – 2016 General Election, Doc. No. 49-24.

[16] It is unclear if this figure represents the number of votes changed in a recount, or the change in the final vote tally, e.g. in a two candidate race, if 5 votes originally counted for candidate A are awarded to B in a recount, whether Defendants' figure represent the five changed votes, or the ten vote change in the final tally.  It is also unclear whether this figure accounts for ballots that were not counted in the original tally then counted in a recount.

intent of a voter." Scanlan Aff., Doc. No. 54-1, ¶ 8. New Hampshire does not consider these ballots negligible, but permits any candidate to "apply for a recount, provided that the difference between the votes cast for the applying candidate and a candidate declared elected is less than 20 percent of the total in the [relevant towns]." RSA 660:1. Moreover, under RSA 660:5, the Secretary of State's Office exempts absentee ballots rejected due to signature mismatch from its recount process. Scanlan Dep., Doc. No. 49-3, at 220:16-221:9. There is no statutory mechanism for reversing moderators' erroneous disenfranchisement for a signature mismatch, even in a close election.

### e. New Hampshire's Mismatched Signature Rejections Are Not "Garden Variety Irregularities."

Next, Defendants seek to ignore the risk of erroneous deprivation by treating rejection of Plaintiffs', and 272 other voters', ballots as negligible "irregularities." Defs.' Mem. at 23. But Defendants' erroneous disenfranchisement of Plaintiffs and other absentee voters cannot be dismissed as an acceptable "variance," or as a "garden variety election irregularities." Defs.' Mem. at 23. In the context of voting rights cases, "the basic truth [is] that even one disenfranchised voter . . . is too many[.]" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015).

Defendants cite *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978), and *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002), for the proposition that New Hampshire's rejection rate is a "variance typical in the conduct of elections," and a "garden variety election irregularity" Defs.' Mem. at 23. Both cases, however, support federal court protection where, like here, federal constitutional rights are implicated and the state does not provide adequate process to correct systemic disenfranchisement.

In *Griffin*, plaintiffs were provided with absentee ballots in a primary for a local special

election. 570 F.2d at 1078-79. Candidate McCormick was the winner by 90 votes after machine

counted ballots were canvassed, but when 123 absentee votes were counted, the plaintiff

(Griffin) was elected by 15 votes and was certified the winner. *Id.* at 1067. McCormick

challenged the results in state court, *id.* at 1067-68, which determined that state law did not allow

absentee voting in primary elections, invalidated the 123 votes, and declared McCormick the

winner. *Id.* at 1068. Days later, the state legislature passed a law *permitting* absentee voting in

primary elections. *Id.* With a motion for re-argument pending in the state supreme court, Griffin

sought a remedy in federal district court, which heard the matter, granted relief, and ordered a

new election. *Id.* at 1068-69.

On appeal, defendants in *Griffin* challenged the propriety of the district court's

intervention into a state's conduct of elections, claiming that federal courts could not adjudicate

errors and irregularities caused by mechanical or human error affecting local and state elections.

*Id.* at 1069-70, 1076. Despite the relatively small number of ballots implicated (123) and the

state supreme court's decision, the First Circuit held that the district court had acted properly in

hearing the federal constitutional claim and that absentee voters had been improperly

disenfranchised, upheld plaintiff's due process rights, and ordered a new election. *Id.* at 1076-

79. The First Circuit articulated a set of principles for federal court involvement in state and

local elections. The appellate court distinguished federal courts' review of garden variety

irregularities from review of a flawed process that goes "well beyond the ordinary dispute over

the counting and marking of ballots" and raises questions germane to the "availability of a fully

adequate state corrective process." *Id.* at 1077 (facial challenge attacks "the fairness of the

official terms and procedures under which the election was conducted," alleging that rejecting

ballots without notice and opportunity is not an error, but "an officially-sponsored election

procedure which, in its basic aspect, was flawed"). *Griffin* recognized that "[t]he right to vote remains, at bottom, a federally protected right." *Id.* at 1077. The *Griffin* case in no way supports Defendants contention that 275 votes are a "garden variety irregularity" or that no process is due to the 275 voters disenfranchised in 2016. This is an axiomatic case for which *Griffin* supports federal court action to protect against the substantial and ongoing risk of erroneous deprivation, and prohibits dismissing Defendants' violation of Plaintiffs federally protected right to vote as a mere "irregularity."

### C.   The Administrative Inconvenience of Additional Procedural Requirements Does Not Justify Total Disenfranchisement.

The third *Mathews* factor requires consideration of the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail. Defendants list three purported justifications for RSA 659:50: (1) "a compelling interest in preventing fraud;" (2) to verify voters' identity; and (3) to instill public confidence in elections. Defs.' Mem. at 18-19, 27. But none of these interests is advanced by denying Plaintiffs notice and an opportunity to cure a perceived mismatch. The only state interest implicated by refusing to provide Plaintiffs notice and process before their vote is rejected—the fiscal and administrative burdens that creating and implementing such procedure would entail— does not outweigh Plaintiffs' protected interest in the right to vote.

With respect to Defendants' asserted interests, there is no evidence in the record that any ballots rejected for mismatched-signatures were submitted fraudulently. *See* Pls.' Mem. at 48-49; *Fla. Democratic Party v. Detzner* ("*Detzner*"), No. 4:16cv607-MW/CAS, 2016 WL 6090943, *1, *7 (2016) ("There is simply no evidence that these mismatched-signature ballots were submitted fraudulently."). And any state interest in screening out fraudulent votes is not served by disenfranchising lawful voters because of penmanship. *See Ne. Ohio Coal. for the*

17

*Homeless v. Husted* ("*NEOCH*"), 837 F.3d 612, 634 (6th Cir. 2016) (holding that Ohio's ballot perfection requirement unconstitutionally "enacted a measure that forces elections boards to reject some identifiable ballots," instead of "explaining the steps that officials should take to positively identify voters before determining that an identification envelope is sufficient or insufficient.").  Nor, as discussed further below, does the signature match requirement have anything to do with verifying a voter's identity.  Moreover, the challenged statute's undisputed effect of disenfranchising qualified voters serves only to damage, rather than enhance, voter confidence.

With respect to the only governmental interest implicated here—the fiscal and administrative burdens that creating and implementing basic due process protections would entail—Defendants have failed to show that providing such due process would be so burdensome as to justify the complete denial of the right to vote for Plaintiffs and other New Hampshire voters.  Defendants' concerns about feasibility must be rejected for several reasons.

*First*, representing the Secretary of State's Office, Deputy Scanlan testified that the office has never studied the feasibility of providing any form of due process to absentee voters to prevent their erroneous disenfranchisement.  *See* Scanlan Dep., Doc. No. 49-3, at 220:7-15. Even the five moderators who have belatedly submitted affidavits in this case say nothing about their ability to contact voters on election day as one means to ensure that qualified voters are not disenfranchised.  In the absence of any factual record, Defendants' feasibility arguments should be given limited weight.

*Second*, the undisputed record demonstrates that there is only *de minimis* administrative inconvenience to implementing a notice and opportunity process.  Despite simultaneously characterizing Plaintiffs' claims as requiring that moderators "seek out and verify the identity of

hundreds of absentee voters," Defendants also claim that only a negligible number of ballots are rejected each election.  Defs.' Mem. at 20.  In fact, the five moderators offering belated affidavit testimony each disenfranchised *2 to 6 voters* pursuant to RSA 659:50(III), and would only need to seek out those voters.  *See* Pillotte Aff., Doc. No. 54-13, ¶ 8; Fowler Aff., Doc. No. 54-14, ¶ 5; Saur Aff., Doc. No. 54-15, ¶ 6; Todd Aff, Doc. No. 54-16, ¶ 15.  In addition, 74% of polling places rejected no ballots pursuant to RSA 659:50 during the 2016 election, Pls.' Mem. at 33, and providing Plaintiffs with due process would have imposed no administrative costs on those 237 polling places.  In the remaining 81 polling places that did reject ballots for signature mismatches, only five polling places reached double digit rejections (Bedford rejected 25, Hudson rejected 19, Portsmouth Ward 03 rejected 10, and Rye was recorded as rejecting 11).  State's Analysis of Absentee Ballots, Doc. No. 49-22.  While moderators perform multiple tasks on election day, the administrative burden for each polling place to contact a handful of voters is not so great as to outweigh Plaintiffs protected interest in the right to vote.

Given this record, the State's argument that moderators are overwhelmed with election day duties is unsupported, and in any event does not outweigh Plaintiffs' protected interest in the right to vote, even considered in the light most favorable to Defendants.  *See Zessar*, 2006 WL 642646 at *9 (finding that the government's interest in administrative convenience was not "so great as to overwhelm plaintiff's interest in protecting his vote."); *Detzner*, 2016 WL 6090943 at *7 (finding that administrative convenience is insufficient to justify the burden on voters imposed by Florida's vote-by-mail procedures on voters with mismatched signatures).  Defendants may not sacrifice the fundamental right to vote at the altar of administrative convenience.  *See id.* at *7 (administrative inconvenience "cannot justify stripping Florida voters of their fundamental right to vote and to have their votes counted").

*Third*, contrary to Defendants' assertion that Plaintiffs seek to have this Court "invalidate the current verification process without providing any reasonably workable alternative," Defs.' Mem. at 21, Plaintiffs have suggested viable alternatives.  *See* Pls.' Mem. at 37-38.  For instance, Plaintiffs suggested that the State, with minimal burden, could attempt to contact each voter— including by a simple telephone call—on or prior to election day— and ascertain whether that voter signed the absentee ballot affidavit envelope.  *See id*.  Defendants claim a phone call will not serve the fraud-prevention or voter-identification interests, because the state could not verify the identity of the voter on the phone.  Defs.' Mem. at 18.  But at present, the signature mismatch statute is only designed to ensure that the same person signed the absentee ballot application and affidavit envelope; it is not to evaluate (unlike a photo identification requirement for in-person voters) whether the person who signed and cast the ballot is actually the voter.  Put another way, the signature mismatch statute for absentee voters, unlike photo identification for in-person voters, does not verify a voter's identity.[17]  The only scenario that the signature match requirement could plausibly prevent is where, as a similar scenario was described by the court in *NEOCH*, "the 'rare' instances where a fraudster manages to swipe the ballot of a registered absentee voter, forge the signature, and return the ballot to the board of elections," *NEOCH*, 837 F.3d at 633.  Add that New Hampshire law requires voters to apply for the ballot and have it sent to them, an imposter would need to request than submit an absentee ballot application, swipe their ballot, then answer the phone on election day.  More likely, with a phone call, voters like

---

[17] Plaintiffs have not, as Defendants claim, "for all practical purposes, accepted signature matching as the desired form of identification for absentee voters."  Defs' Mem. at 18-19.  In response to the question "[j]ust kind of talking still almost philosophically, can you tell me, what is the purpose of a signature, in your own words?" Dr. Mohammed explained that a signature is developed as a form of "identification" *as compared to* handwriting, which is developed as a means of "communication."  Mohammed Dep., Doc. 54-11, at 23:25-24:10.

Ms. Heard and Mr. Fitzpatrick can confirm that they had, in fact signed both the application and ballot envelope, and a voter like Mrs. Saucedo will have the opportunity to explain that she is blind, and cannot consistently sign the same way.

Moreover, Defendants for the first time disclosed in their filing that moderators "consider all of the evidence available to them, including their personal knowledge of the voter or the personal knowledge of another election official."  Defs.' Mem. at 11; *see, e.g.,* Todd Aff., Doc. No. 54-16, ¶ 13 ("In applying this standard, I consider all evidence presented or available to me, not just the signatures on the page.  This includes my personal knowledge of, or familiarity with the voter information contained on the absentee ballot envelopes or request form."), ¶ 18 (relied on an assistant moderator's personal knowledge of the voter, including her age, and her signature based on having "seen the voter's signature on medical documents before," and rejected the ballot."). Given these moderators' practice of considering information external to the application and envelope affidavit when conducting signature matches, the additional information obtained by speaking with the voter is at least as reliable and efficient.

*Fourth*, New Hampshire's election day canvas requirement does not prevent it from providing voters with notice and opportunity to cure.  And this short time frame does not prevent it from providing some process such as the phone calls suggested by Plaintiffs.[18]

As compared to other states, New Hampshire's same-day counting requirement does not substantially distinguish the administrative burden here from the process other states are able to undertake.  Other states provide notice and an opportunity to cure on a much larger scale.

---

[18] Moreover, clerks are required to attach the absentee ballot application to the ballot envelope when the ballot is received.  RSA 657:18.  Although the moderator begins processing absentee ballots at 1:00pm on election day, unless a different time is posted consistent with RSA 659:49, there is no law prohibiting an initial screening of the envelope when the ballot is received.

*Detzner*, at *8 (Florida) (requiring the state provide notice and opportunity to cure for thousands of mismatched signature voters who had been disenfranchised during a vote-by-mail process in which several million voters participate in presidential election years); Mitchell Aff. ¶ 13, *La Follette v. Padilla*, No. CPF-17-515931 1, 2 (Cal. Super. Ct. Jan. 4, 2018) (estimating that in the 2016 election, anywhere from 33,000 to 45,000 votes were rejected statewide for signature non-match).  And while Defendants note that other states have a canvass period for provisional ballots that extends beyond election day, Defs.' Mem. at 19-20, those states also process an extraordinary number of ballots.[19]

The fact that New Hampshire has no process in place to cure ballots without a signature, and would purportedly need an "entirely new process," as compared to Florida and California is also not a defense to the constitutional requirements.  Defs.' Mem. at 20-22.  Florida implemented its cure process for ballots with no signature for the first time not long before the relevant court decision.  *Detzner*, 2016 WL 6090943 at *2 (The Florida legislature had recently

---

[19] Based on the information Massachusetts provided to the Election Assistance Commission through the Election Administration and Voting Survey in 2016, it rejected a total of 5,152 absentee ballots, and was obligated under Mass. Gen. Laws Ann. 54 § 94 to provide notice that the ballot was rejected and provide a new substitute ballot. Pls.' Mem. at 38.  This must be complete by 5:00 p.m. on the third day after a presidential or state primary or the twelfth day after a state election. Defs.' Mem. at 19.  Oregon provides notice to those whose absentee ballot was rejected due to a failure in signature matching.  *See* Pls.' Mem. at 38, n.11.  Based on the survey data supplied by Oregon jurisdictions to the EAC, 9,637 ballots were rejected for this reason.  Oregon allows a challenged ballot to be counted up to 14 days following an election. *See* Defs.' Mem. at 20.

Defendants also cite to the processes in Illinois and Pennsylvania.  The Court in *Zessar* did not rely on Illinois's slightly longer provisional ballot canvas period in holding the lack of notice and an opportunity to cure unconstitutional.  2006 WL 642646, *1, *10.  It recognized that providing due process "would pose some additional administrative and fiscal burden on the election authorities," but ruled in plaintiff's favor based on the fundamental nature of the right to vote. *Id.* at *9.  A Pennsylvania court applying strict scrutiny enjoined a Voter ID law as facially unconstitutional because it "does not provide a non-burdensome means of obtaining compliant photo ID" despite the administrative burden of doing so.  *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, *1 (Pa. Commw. Ct. Jan. 17, 2014).

amended its law to allow no-signature ballots to be cured in 2013, which took effect in 2014, Fla. Stat § 101.68 (2013), two years before the court's decision.).  California drastically expanded its use of voting by mail in 2016, and few counties had provided an opportunity to cure no-signature ballots prior to the court decision.  *See* Cal. Elections Code §§ 4005-06 (Added by Stats. 2016, Ch. 832, Sec. 4. (SB 450) Effective January 1, 2017) (expanding the number of counties that conduct all-mailed elections, and requiring elections officials to "make a reasonable effort to inform a voter of either . . . if the voter's vote by mail ballot envelope is missing a signature [and h]ow the voter can correct the missing signature.").  The severity of New Hampshire's constitutional violation – that there is zero notice and zero process – is not a reason that it should not be remedied.

## II.      RSA 659:50(III) Violates the Fundamental Right to Vote And Therefore, Equal Protection.

In their opposition brief, Defendants do not dispute that the Equal Protection Clause prohibits any encumbrance on the right to vote that is not adequately justified by a valid state interest.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992).  The ultimate question is whether the government's "legitimate interests" "outweigh" the burden the law imposes on the voters.  *See Burdick*, 504 U.S. at 440.  A law that imposes a burden on voting must satisfy a balancing test that weighs the severity of the burden against the "precise interests" the state proffers as justifications for the law.  *Burdick*, 504 U.S. at 434; *see Crawford*, 553 U.S. at 191 ("However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.") (internal citation and quotation omitted).

Here, the undisputed evidence demonstrates that Plaintiffs and other absentee voters have been disenfranchised through no fault of their own, without any notice or an opportunity to cure

a perceived signature mismatch.  That categorical deprivation of the right to vote in

circumstances beyond the control of the voter amounts to, at a minimum, a substantial burden on

the right to vote, and merits close scrutiny of the state's purported interests.  And here, there is

no evidence that RSA 659:50(III) actually advances the state's asserted interest in preventing

fraud.  Indeed, there is "no rational relationship" between the state's refusal to offer notice and

an opportunity to cure, and the state's asserted interests.  *Detzner*, 2016 WL 6090943, at *7.

### A.  RSA 659:50(III) Imposes a Substantial Burden on Voters.

In their brief, Defendants contend that RSA 659:50(III) does not place a substantial

burden on voters, because, in their view, there is only a "slight risk of an erroneous deprivation

under the current procedures."  Defs.' Mem. at 22.  That is the incorrect standard for assessing

whether a law places a substantial burden on voting for purposes of an *Anderson-Burdick*

analysis.  Rather, federal courts have held that a law places a substantial burden on the

fundamental right to vote where, as here, voters do not have control over whether they are

disenfranchised, or when disenfranchisement is automatic or categorical.  *See Husted*, 696 F.3d

at 593-94 (establishing that burden on voters is substantial where voters went to the correct

polling place but poll workers directed them to the wrong precinct and the voters' provisional

ballots were rejected despite their compliance with official instructions); *id.* at 586-587

(describing and affirming district court's finding that "automatic" disqualification of wrong-

precinct provisional ballots will cause future voters to be "severely burdened"); *Hunter v.*

*Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 235, 238 (6th Cir. 2011) (granting preliminary

injunction on due process grounds where "disenfranchisement was applied to [wrong-precinct

provisional] voters who may bear no responsibility for the rejection of their ballots"); *see also*

*Stewart v. Blackwell*, 444 F.3d 843, 860-61 (6th Cir. 2006) (distinguishing the minimal burden in

*Burdick*, where the voter failed to comply with a statutory requirement, from a more substantial

burden "not within the control of the voters"), *vacated as moot*, 473 F.3d 692 (2007).

Indeed, the undisputed evidence here demonstrates that Plaintiffs, and hundreds of other absentee voters who have complied with all requirements to obtain and cast their ballot, have been disenfranchised for reasons totally beyond their control—*i.e.*, the subjective determination of an election moderator that their signatures do not match—and are left without any possible recourse (or even given any notice). Here, voters are required to sign both their absentee ballot application and ballot envelope affidavit. Plaintiffs, and other voters who adhered to that requirement, completed the voting process when they returned their ballot to the moderator. *See* RSA 657:6 (procedure by applicant) (An application "shall be filled out by the applicant and sent to the clerk of the town or city in which he or she desires to vote."); RSA 657:17 (procedure by voter) (after marking the ballot and sealing it in an inner envelope, "[t]he voter shall execute the affidavit on the envelope."). The matter is, at that point, out of voters' hands; it is then that *moderators* decide whether to reject absentee ballots based on their subjective determination that a voter's affidavit envelope signature "appears" to be signed by a different person than the one who signed the application. RSA 659:50(III). The statute by its own terms grants the moderator sole discretion to reject absentee ballots, based on their own judgment. *See id.* There is no dispute that hundreds of voters have had their ballots rejected as a result.

This statutory scheme—which indisputably disenfranchises hundreds of voters in general elections for reasons beyond their control, without any notice or failsafe procedure—clearly amounts to a substantial or severe burden on the fundamental right to vote, and merits heightened scrutiny. *See Detzner* at *6 ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."). To the hundreds of voters whose ballots have been rejected under this statutory scheme for reasons

outside of their control, it is cold comfort that, in Defendants' words, the signature match procedure "results in an extremely low percentage of rejected ballots."  Defs.' Mem. at 17-18. *See Husted*, 696 F.3d at 593 (rejecting state's argument that burden is slight because "wrong-precinct ballots make up a small percentage of the total votes cast," and invalidating law that affected less than 0.248% of ballots cast in 2008 election).  "[E]ven one disenfranchised voter . . . is too many."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

To be clear, Plaintiffs do not challenge the state's requirement that voters sign their absentee ballot application and ballot envelope affidavit.  Rather, Plaintiffs assert that RSA 659:50(III) imposes a substantial burden on voting because it fails to protect qualified voters from improper disenfranchisement, despite their compliance with all statutory requirements for casting their ballot.

## B.  State Interests in Declining to Provide Notice And Opportunity to Cure Are Insufficient.

Defendants cite three justifications for disenfranchising Plaintiffs: (1) "a compelling interest[] in preventing fraud," (2) verifying voters' identity, and (3) instilling public confidence in elections.  *See* Defs.' Mem. at 18-19, 27.  New Hampshire's signature match procedure, including the rejection of ballots without affording an affected voter notice or an opportunity to cure, does not serve any of these interests.

### a.  An Abstract Interest in Preventing Fraud Ss Insufficient to Justify the Rejection of Absentee Ballots Without Due Process.

Defendants' asserted interest in preventing voter fraud is insufficient to justify RSA 659:50(III), for two simple reasons.  First, Defendants have conceded that there is no widespread voter fraud in New Hampshire, and no widespread fraud concerning absentee ballots. *See* Pls.' Mem. at 46.  The State has provided no evidence that any of the absentee ballots ever

rejected by moderators due to signature "mismatch" were the result of voter impersonation or fraud. *See id.* citing Scanlan Dep., Doc. No. 49-3, at 192:19-193:14. In light of the undisputed evidence that hundreds of voters have been disenfranchised by the signature match requirement, the mere assertion—without any evidence that such fraud has occurred or has been prevented by the requirement—is insufficient to justify the law. Second, even if such fraud had occurred, RSA 659:50(III) is not an appropriate solution. Voter fraud—specifically, a person signing either the absentee ballot application or the absentee ballot affidavit envelope to impersonate a voter and cast his or her ballot fraudulently —is not served by the state's refusal to offer any notice and process for voters who are deemed to have failed the signature match requirement. *See* Pls.' Mem. at 46-48.

Defendant's heavy reliance on *Crawford v Marion County Election Bd.*, 553 U.S. 181 (2008), to justify RSA 659:50 is misplaced. It does not follow from the Supreme Court's acknowledgement that states have a legitimate interest in preventing voter impersonation, that such an interest justifies New Hampshire's practice of denying absentee voters notice and an opportunity to cure a perceived signature mismatch on absentee ballots. Not only is the state's refusal to offer notice and an opportunity to cure untethered to confirming identity, the record in this case is also distinguishable from *Crawford*. Defendants claim that because Indiana did not show concrete evidence of impersonation fraud in *Crawford*, New Hampshire need not show "incidents of actual voter fraud by absentee ballot" in this case. Defs.' Mem. at 26-27. In *Crawford*, however, the Court found that plaintiffs had "not introduced evidence of a single, individual Indiana resident" actually disenfranchised by the challenged ID law. 553 U.S. at187 (The district court found that petitioners had "not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of SEA 483 or who will have his or her

right to vote unduly burdened by its requirements.") (internal citation and quotation omitted)).

By contrast, here, Plaintiffs have provided undisputed evidence of voters erroneously

disenfranchised, including the three Plaintiffs, witness Mary Jo Vien, and three voters in Tilton,

Merrimack and Hudson, whose ballots were rejected by moderators, but whose signature Deputy

Secretary Scanlan confirmed at deposition should have been considered a match pursuant to the

state standard, *see* Pls.' Mem. at 35-36; Scanlan Dep., Doc. No. 49-3, at 194:14-23, 196:6-10,

196:18-23.  Given the record of disenfranchised voters in this case, the mere assertion of fraud

without any actual evidence is insufficient.  *See* Pls.' Mem. at 48; *see also Detzner*, 2016 WL

6090943, at *7 ("There is simply no evidence that these mismatched-signature ballots were

submitted fraudulently.  Rather, the record shows that innocent factors—such as body position,

writing surface, and noise—affect the accuracy of one's signature."); *NEOCH*, 837 F.3d at 631-

33 (rejecting Ohio's requirements for absentee ballots on *Anderson-Burdick* grounds because of

the "lack of any coherent fraud argument."); *Veasey*, 830 F.3d at 262 ("[T]he articulation of a

legitimate interest is not a magic incantation . . .").

      Moreover, unlike in *Crawford*, Defendants have failed to suggest a meaningful

relationship between the challenged restriction—*i.e.*, the failure to provide notice and an

opportunity to cure—and the state's interest in preventing fraud.  *See Perez-Guzman v. Gracia*,

346 F.3d 229, 239, 245 (1st Cir. 2003) (requiring that regulations imposing "severe restrictions

on ballot access" must be narrowly drawn to advance the state's specific interest, advising that

such restrictions should be viewed "skeptically," and noting "[t]he fact that a state's asserted

interest in preventing electoral fraud is important in the abstract does not create a presumption

that its chosen means of regulation will advance that interest."); *Fulani v. Krivanek*, 973 F.2d

1539, 1544 (11th Cir. 1992) (Even if "[t]he state identifies interests that courts have found

compelling in other cases," a burdensome requirement may not be upheld if "it fails to explain the relationship between these interests and the classification in question.").  A state's interest in screening out fraudulent votes is not served by disenfranchising lawful voters for penmanship without notice and an opportunity to cure.[20]  Thus, the precise interests put forward by Defendants—preventing voter fraud—does not necessitate the exceptional burden of total disenfranchisement without notice and an opportunity to cure.  And even if a signature match requirement could meaningfully deter absentee voter fraud, the less restrictive alternative is to contact the voter and provide an opportunity for them to provide additional information.[21]

### b. RSA 659:50 Is Not Comparable to the 2013 In-Person Photo ID Requirement.

In contrast to photo ID requirements where the voter appears in person, signature matching does not serve to identify voters.[22]  Defendants' deposition testimony does not support

---

[20] To explain the purpose of the signature match requirement, Defendants cite two inapposite cases: *Purcell v. Gonzalez*, 549 U.S. 1 (2006) and *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989).  *See* Defs' Br. at 18, 26.  The Court in *Purcell v. Gonzalez*, 549 U.S. 1 (2006), noting both a state's interest in election integrity, and "plaintiffs' strong interest in exercising the 'fundamental political right' to vote," "express[ed] no opinion here on the correct disposition" of the substantive matter.  It did, however, advise that "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."  *Id.* at 4.  In *Eu*, the Court struck down a law that prohibited parties from endorsing a primary candidate on First Amendment grounds, in part because managing a political parties' internal affairs did not raise "the derogation of . . . civil rights."  489 U.S. at 231-32.  This case by contrast, squarely raises the complete and unjustified denial of Plaintiffs' fundamental rights.

[21] Likewise, Defendants claimed "prophylactic effect" of the signature match requirement—that clerks field inquiries about whether someone may request an absentee ballot for a friend or relative—is not served by comparing signatures or rejecting ballots.  Defs.' Mem. at 26.  Requiring a voter to sign their absentee ballot application, and also providing notice and opportunity to cure a perceived mismatch, would presumably have the same effect.

[22] A voter's application signature is not compared to anything.  Scanlan Dep., Doc. No. 49-3, at 140:21-23.  Even if an election official could accurately determine whether an application and ballot affidavit were signed by the same person, there is no method for determining whether they were signed by the voter.

the claim that New Hampshire uses signature matching "instead of" photo ID.  Defs.' Mem. at

18-19.  Moreover, New Hampshire did not require polling place voters to present photo ID until

September 2013, *see* 2011 N.H. Laws 659:13. Prior to 2013 voters attending the polls would

simply provide their name and address, which the ballot clerk repeats and the voter confirms,

then they are given a ballot, whereas the signature match requirement has been in place since at

least 1979. *See* Scanlan Dep., Doc. No. 49-3, at 31:11-33:13.[23]

Moreover, New Hampshire has a procedure to protect against erroneous

disenfranchisement for voters who lack acceptable ID.  If the voter does not have acceptable ID,

they vote by challenge voter affidavit, and their ballot is counted.  RSA 659:13(I)(c)(1).  Their

photo is taken by the clerk, 659:13(I)(c)(2), unless the photo equipment is broken or they refuse

for religious observance, 659:13(I)(c)(3), in which case they may still vote, and they are sent a

letter notifying them that "a person who did not present valid photo identification voted using his

or her name and address and instruct the person to return the letter within 30 days with a written

confirmation that the person voted."  RSA 659:13(IV)(a); *cf. Crawford*, 553 U.S. at 199-200

(finding severity of burden mitigated by fact that "voters without photo identification may cast

provisional ballots that will ultimately be counted."  The availability of this option for in-person

voters supports the feasibility of providing absentee voters with a comparable option.  Other

New Hampshire elections laws similarly recognize that minor, correctible errors should not

result in disenfranchisement.  *See* RSA 659:54 ("No absentee ballot shall be rejected by the

moderator for any immaterial addition, omission, or irregularity in the preparation or execution

---

[23] There is no support, in fact or in any court decision, for Defendants' hypothesis that providing due process to mismatch voters before rejecting their ballots while maintaining the current in-person photo ID requirements will create "an imbalance in the system could drive voters away from the democratic process."  Defs' Mem. at 27.

of any writing or affidavit required herein."); RSA 659:22 ("Any voter who spoils a ballot [] may receive others, one at a time, not to exceed 3 ballots in all.").

### c. There Is No Evidence That Denying Notice and Opportunity to Cure Increases Public Confidence in Elections.

The State claims that denying voters due process furthers "an interest in protecting public confidence in the integrity of the electoral process."  Defs.' Mem. at 27.  However, public confidence is not served by disenfranchising Plaintiffs and other similarly-situated voters without their knowledge and an opportunity to cure.  In fact, the public will likely *lose* confidence when qualified, eligible voters, who do everything required of them to vote, are disenfranchised.  *See One Wisconsin Inst. v. Nichol*, 155 F. Supp. 3d 898, 902 (W.D. Wisc, 2015) (expressing skepticism at the notion that voter identification laws promote confidence in elections, noting that photo ID requirements may undermine rather than promotes confidence in elections).  Providing notice and an opportunity to cure a perceived signature mismatch amplifies election integrity.

## III.    RSA 659:50(III) Violates Equal Protection Based on Lack of Uniformity.

RSA 659:50(III) violates the Fourteenth Amendment's equal protection guarantee because the statute is not being—and cannot be—uniformly and consistently applied in New Hampshire.  *See Bush v. Gore*, 531 U.S. 98, 106 (2000) ("The problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary."); Pls.' Mem. at 51-52.  Defendants repeatedly refer to the "standard" set out in the Election Manual: "The test for whether the application and affidavit appear to be signed by the same person is whether this is more likely than not.  Absentee ballots should be rejected because the signatures do not match only if the differences in the signatures are significant."  N.H. Election Procedure

31

Manual: 2016-2017, Doc No. 49-19.  But specifying "more likely than not" simply gives the moderator instructions on how sure they must be of a perceived mismatch.  It does not provide "adequate statewide standards for determining what is a legal vote," as required by *Bush v. Gore*, 531 U.S. at 110.  Similarly, the Manual instructs moderators to "be prepared to explain . . . what specific characteristics on the two signatures were the basis of the decision that they were more likely than not signed by different people," N.H. Election Procedure Manual: 2016-2017, Doc No. 49-19,at 67, but does not provide a uniform instruction for which differences are acceptable, or a definition for "significant" difference.

Defendants are correct that Plaintiffs have not alleged a discriminatory motive behind RSA 659:50, or its disparate impact on a suspect class.  Defs.' Mem. at 25.  Nonetheless, "[c]lassifications which affect fundamental rights are also subject to strict forms of review." *Black v. McGuffage*, 209 F. Supp. 2d at 897 (citing several Supreme Court cases, including *Shelton v. Tucker*, 364 U.S. 479, 488, (1960)).  "[T]he Supreme Court has not strictly adhered to the suspect classification doctrine when addressing cases of voting rights with respect to States." *Id.* at 898.  Once the State has endowed voting rights to its citizens, "the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush,* 531 U.S. at 104.  "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another," *id.* at 104–105.  With no uniform standard, some moderators will necessarily "choose a system with less accuracy than others," *Black*, 209 F. Supp. 2d at 899, leading to disparate rejection rates.  In New Hampshire, disenfranchisement rates differ significantly by polling place.  Pls.' Mem. at 32-36; *see also Black*, 209 F. Supp. 2d at 899 ("That people in different counties have significantly different

probabilities of having their votes counted, solely because of the nature of the system used in their jurisdiction is the heart of the problem.").

Defendants cite *NEOCH*, 837 F.3d at 635-36, in which the court rejected plaintiffs' argument that Ohio lacked adequate statewide standards, and held that "the elections boards are guided by clear prescriptive statewide rules that apply equally to all voters."  However, while the court in *NEOCH* denied plaintiffs' *Bush v. Gore* claim, at the same time, it held that the statewide standards were *so* stringent and burdensome, and inadequately justified by a state interest, that it violated the Equal Protection Clause according to the *Anderson-Burdick* standard.  *See NEOCH*, 837 F.3d at 633-34.

Defendants also cite *State ex rel. Potter v. Harris*, 2008 WL 3067187 (Tenn. Ct. App. Aug. 4, 2008) and *Malinou v. Board of Elections,* 271 A.2d 798 (R.I. 1970).  But neither case considered federal constitutional protection for the voters' fundamental right to vote.  In *Harris* the court did not decide any constitutional question and explicitly held that "the right to petition for a referendum, unlike the right to vote, is not constitutionally compelled."  *Harris*, 2008 WL 3067187, *1, *8 (dismissing plaintiffs' constitutional claim).  And in *Malinou*, a case challenging the process to become a candidate in a state primary election, there was no federal constitutional right implicated; the court adjudicated the case under the state constitutional grounds.  *Malinou*, 271 A.2d at 800-801; *see also Felice v. R.I. Bd. of Elections*, 781 F. Supp. 100, 104 (D. R.I. 1991) ("On the other hand, regulation that impinges on fundamental rights is subject to strict scrutiny and must be necessary to promote a compelling governmental interest.") (internal citation omitted).  These cases do not support Defendants' position.

## IV.    Plaintiffs Have Met the Burden of a Facial Challenge to RSA 659:50.

To mount a successful facial challenge to a statute, a plaintiff must show that "no set of

circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But this standard is deemed to be met when plaintiffs meet the facial standard for procedural due process claims under *Matthews*, the facial standard for voting claims under *Anderson/Burdick*, or the facial standard for equal protection voting claims under *Bush v. Gore*. These three claims—each embedded in the Fourteenth Amendment—have separate and independent standards for facial challenges. If these Fourteenth Amendment standards are satisfied—and they are here—then "no set of circumstances" would exist under which the challenged statute would be constitutional. *See Daskalea v. Wash. Humane Soc'y*, 480 F. Supp. 2d 16, 36 n.22 (D. D.C. 2007) (noting that "[a] statute that does not satisfy the requirements of the Fourteenth Amendment *does satisfy* the 'no set of circumstances' test of *United States v. Salerno*") (emphasis added). Consequently, there is no set of circumstances under which RSA 659:50(III) does not violate absentee voters' constitutional rights in the event of a signature mismatch. Plaintiffs have therefore mounted a successful facial challenge.

Defendants suggest that RSA 659:50(III) leaves "room for discretion in [its] application" because moderators use their discretion to reject ballots, and is not therefore subject to a facial challenge. But, with respect to notice and opportunity to cure, this statute is one which "has no such play in the joints." *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016). It is indisputable that the statute provides no "room for discretion" with regard to the provision of notice and opportunity. *See* RSA 659:50(III). Contrary to Defendants' position, the constitutional inquiry is focused not only on what RSA 659:50(III) does contain, but also on what it lacks. On its face, the law fails to provide process and, in so doing, creates a severe burden on voting rights. Thus, on its face, the challenged statute is invalid.

Even if the proper focus of the facial challenge is on the moderatos' discretion to reject

ballot signature, as opposed to the lack of due process protection afforded after the fact,

RSA 659:50(III) cannot be saved by a "limiting construction" that Defendants suggest: to

consider training for moderators mandatory.  Defs.' Mem. at 15-16, 24.  While courts may adopt

a narrowing construction to save a law from unconstitutionality if the law is "readily susceptible"

to that limitation, *see Reno v. ACLU*, 521 U.S. 844, 884 (1997), no such susceptibility exists

here.  Courts "will not rewrite a state law to conform it to constitutional requirements."  *Virginia*

*v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *see also Doe v. Harris*, 772 F.3d 563, 578

(9th Cir. 2014).  As the Supreme Court has explained, "doing so would constitute a serious

invasion of the legislative domain and sharply diminish [the legislature's] incentive to draft a

narrowly tailored law in the first place."  *United States v. Stevens*, 559 U.S. 460, 481 (2010) ("To

read [the law] as the Government desires requires rewriting, not just reinterpretation.").  The

New Hampshire Supreme Court has embraced these principles in holding that laws that

unconstitutionally allow for arbitrary decision-making cannot be rewritten by the courts to save

them.[24]

     As Defendants acknowledge, mandatory moderator training does not exist under current

New Hampshire law.  There is nothing logical nor "limiting" about Defendants' proposal that the

statute should be read to include the entirely new and unrelated mandate that moderators attend

training sessions.  RSA 659:50(III) simply is not "readily susceptible" to the addition of

---

[24] *See, e.g., Montenegro v. N.H. DMV*, 166 N.H. 215, 224 (2014) (striking down regulation that encouraged "arbitrary and discriminatory enforcement," and declining to "add or delete text to the regulation" to save it); *State v. Brobst*, 151 N.H. 420, 422, 425 (2004) (holding that a section of harassment statute was facially overbroad, and concluding that the Court could not envision a limiting construction "that would allow us to limit the scope of the statute without invading the province of the legislature"); *State v. Lukas*, 164 N.H. 693, 694 (2013) (Citing "the oft-repeated maxim that courts may not add words to a statute that the legislature did not see fit to include"); *Balke v. City of Manchester*, 150 N.H. 69, 73 (2003) ("We will not rewrite the statute; that is the province of the legislature.").

"words . . . that the legislature did not see fit to include." *Lukas*, 164 N.H. at 694. If the New Hampshire legislature did not see fit to require moderators to attend training sessions in order to encourage fewer absentee ballot rejections, surely it is beyond the power of a federal court to compel local moderators to do so. Such a broad judicial act would be particularly troublesome given that federal courts are "more constrained in the use of 'narrowing' constructions when interpreting state laws," *Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*, 221 F.3d 235, 241 (1st Cir. 2000) (citing *Nat'l Pharmacies, Inc. v. Feliciano-de-Melecio*, 51 F. Supp. 2d 45, 58 (D.P.R. 1999) and cases cited therein), even if they are nevertheless instructed to use constitutional avoidance when possible, *id.* at 241-42 (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 78 (1997)). A judicial reconstruction of RSA 659:50(III) that compels non-party local elective officials to attend training sessions would "constitute a serious invasion of the legislative domain." *Stevens*, 559 U.S. at 481. In any event, such a "limiting construction" would do nothing to remedy the constitutional affront at issue here. The challenged statute would still not provide due process to voters.[25] To vote absentee in New Hampshire means to take the risk that your vote may be discarded without your knowledge and without the possibility of reversal. Such risk is both severe and applicable to all absentee voters whose signatures allegedly do not match. Moreover, this burden is not merely hypothetical; in the event of a signature mismatch, disenfranchisement is certain. Plaintiffs' facial challenge is proper.

---

[25] Nor may Plaintiffs' lawsuit be reimagined to an as-applied challenge. Defs.' Mem. at 24, 32. If moderators are mandated by this court to attend training, the number of rejections may (or may not) decrease, but those who are rejected still will not be made aware of their rejection and will lack any ability to contest it. With no remedial process of any kind once an alleged mismatch is determined, the unconstitutional law cannot be saved through moderator instruction.

V.    **Plaintiffs Are Entitled to Judgment Under the Americans with Disabilities Act, and Defendants' Motion Should Be Denied.**

A.    **Plaintiffs' Claims Are Not Mooted by the 2017 Legislative Changes.**

Defendants contend that Plaintiffs' claims under the ADA are moot by virtue of the 2017

legislative changes.  However, as the parties agree, the amended law does not exempt a person

with a disability who votes absentee and who does not receive assistance in signing the ballot

application or affidavit envelope.  Pls.' Mem. at 58; Scanlan Dep., Doc. No. 49-3, at 200:11-17.

Plaintiffs' undisputed evidence shows that people with disabilities remain vulnerable to being

disenfranchised by the signature-match law, even as amended.  Plaintiffs' signature expert Dr.

Mohammed testified that individuals with disabilities, elderly individuals, and individuals who

are ill[26] are more likely to have variability in their signatures, and thereby are more likely to be

---

[26] Elderly individuals and individuals with serious illnesses typically qualify as having disabilities as this term is defined by the ADA, as amended in 2008.  *See* 42 U.S.C. § 12102; 28 C.F.R. § 35.108.  28 C.F.R. § 35.108(d)(2)(iii) ("Deafness substantially limits hearing; . . . [b]lindness substantially limits seeing; . . . [p]artially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; . . . [c]ancer substantially limits normal cell growth; . . . [d]iabetes substantially limits endocrine function"); *Nguyen v. City & Cty. of Denver, Colorado*, 286 F. Supp. 3d 1168, 1181 (D. Colo. 2017) (finding that individual with hearing loss and hearing aids "is plainly disabled under the ADA"); *Medearis v. CVS Pharmacy*, 92 F. Supp. 3d 1294, 1304 (N.D. Ga. 2015), *aff'd sub nom. Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891 (11th Cir. 2016) (finding that plaintiff established that his rheumatoid arthritis constitutes a disability under the ADA); *Holland v. Methodist Hosps.*, No. 2:14-CV-88-PRC, 2016 WL 5724355, at *14 (N.D. Ind. Sept. 30, 2016) (finding that plaintiff with scoliosis, arthritis, heart blockage, and pacemaker created triable issue on disability); *Torres v. Junto De Gobierno De Servicio De Emergencia*, 91 F. Supp. 3d 243, 252 (D.P.R. 2015) ("Plaintiff's claim appears to sufficiently allege that he was a qualified individual with a disability that substantially limits a major life activity, that being Parkinson's disease"); *Thomas v. Hill*, No. CIV.A. 13-2326, 2014 WL 3955656, at *6 (W.D. La. Aug. 13, 2014), *aff'd*, 621 F. App'x 278 (5th Cir. 2015) (finding that plaintiff with heart condition necessitating triple bypass surgery and rehabilitation created triable issue on disability); *Buser v. Eckerd Corp.*, No. 5:12-CV-755-FL, 2015 WL 418172, at *7 (E.D.N.C. Feb. 2, 2015) (finding that plaintiff with osteoarthritis and hip-replacement surgery created triable issue on disability); *Marsh v. Terra Int'l (Oklahoma), Inc.*, 122 F. Supp. 3d 1267, 1281 (N.D. Okla. 2015) (finding that plaintiff established *prima facie* case that his knee injury with osteoarthritis is a disability under the ADA); *Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC*, 15 F. Supp. 3d 274, 282 (E.D.N.Y. 2014) (finding that plaintiff with

incorrectly excluded by signature-matching schemes such as the one employed by Defendants here.  Mohammed Expert Rep., Doc. No. 49-21, ¶¶ 27, 36, 37, 42, 46-50.  The disenfranchisement caused by the variability in the handwriting of disabled and elderly individuals is not resolved by the 2017 amendment.

Further, Plaintiffs have identified a pattern of disabled voters being disenfranchised based on moderators' determinations that signatures do not match.  A significant proportion – 20 percent – of the ballots rejected through the signature-match screen were from people who voted absentee due to a disability.  *See* Absentee Ballot Applications and Absentee Ballot Affidavit Envelopes, Doc. No. 49-7 (under seal); Pls.' Chart Re: Disabled Voters, Doc. No. 49-8. While some of these rejected ballots were from disabled voters whom we know received assistance in signing their ballot applications or affidavit envelope, *see*, *e.g*, Vien Aff., Doc. No. 48-4;

---

severe aortic regurgitation and valve replacement surgery created triable issue on disability); *McDaniels v. Grp. Health Co-op*., 57 F. Supp. 3d 1300, 1314 (W.D. Wash. 2014) (noting that defendant concedes for purposes of this motion that plaintiff with arthritis in her knee and sciatica is disabled under the ADA); *Feist v. Louisiana, Dep't of Justice, Office of the Att'y. Gen*., 730 F.3d 450, 453 (5th Cir. 2013) (noting that the parties do not dispute district court finding that plaintiff with osteoarthritis is an individual with a disability); *Hawkins v. Schwan's Home Serv., Inc*., No. CIV-12-0084-HE, 2013 WL 2368813, at *4 (W.D. Okla. May 28, 2013), *aff'd*, 778 F.3d 877 (10th Cir. 2015) (finding that plaintiff with heart problems and a pacemaker "has met his burden to establish" a disability); *Moates v. Hamilton Cty*., 976 F. Supp. 2d 984, 992 (E.D. Tenn. 2013) ("Under the burden imposed by the ADAAA, it is clear that Plaintiff's rheumatoid arthritis would constitute a qualifying disability."); *Salser v. Clarke Cty. Sch. Dist*., 802 F. Supp. 2d 1339, 1354 (M.D. Ga. 2011) ("It is undisputed that [plaintiff with rheumatoid arthritis] is disabled within the meaning of the ADA."); *Jackson v. J. Lewis Crozer Library*, No. CIV.A 07-481, 2010 WL 3491354, at *4 (E.D. Pa. Aug. 31, 2010), *aff'd*, 445 F. App'x 533 (3d Cir. 2011) ("There is no question here that Ms. Jackson has a disability.  Her macular degeneration has rendered her legally blind."); *see also* 29 C.F.R. Pt. 1630 App., § 1630.2(h) ("Advanced age, in and of itself, is also not an impairment.  However, various medical conditions commonly associated with age, such as hearing loss, osteoporosis, or arthritis would constitute impairments within the meaning of this part.  *See* 1989 Senate Report at 22–23; 1990 House Labor Report at 51–52; 1990 House Judiciary Report at 28–29.").

Absentee Ballot Applications and Absentee Ballot Affidavit Envelopes, Doc. No. 49-7, at 301-304 (signature initialed), 374-75 (same), others were from disabled voters for whom there is no evidence of such assistance.  *See*, *e.g.*, *id.* at 4-6, 35-36, 156-57, 218-19, 269-71, 274-276, 367-69; Mohammed Expert Rep., Doc. No. 49-21, ¶¶ 47-48 (discussing 218-19).

Plaintiff Saucedo's claim is not moot as she remains vulnerable to being disenfranchised in future elections.  She has a disability that impairs her ability to write legibly or consistently, and that has caused her signature to change over time.  A. Saucedo Dep., Doc. No. 49-6, at 16:8-12; M. Saucedo Dep., Doc. No. 49-5, at 20:11-15, 21:2-12.  And while she had her husband's assistance in signing her ballot application in 2016, Ms. Saucedo signs her own documents at times.  A. Saucedo Dep., Doc. No. 49-6, at 23:15; M. Saucedo Dep., Doc. No. 49-5, at 16:17-22.  Any time disabled voters such as Plaintiff Saucedo execute their voter documents without assistance, they are subject to the signature-matching requirement and the risk of having their ballot improperly rejected without notice.  (The risk also exists if a disabled voter receives assistance but the assistant fails to complete the attestation.)

Defendants contend that Saucedo's "husband has been assisting her in voting for years, and that "[a]ny suggestion that Saucedo, at the age of 97, might change that established practice is entirely speculative and insufficient to create an actual case or controversy."  Defs.' Mem. at 34 n.5 (citation omitted).  But this is hardly speculative.  Plaintiff Saucedo signs her own documents at times.  A. Saucedo Dep., Doc. No. 49-6, at 23:15; M. Saucedo Dep., Doc. No. 49-5, at 16:17-22.  And while Plaintiff Saucedo is 97, her husband is 88.  Should Mr. Saucedo become unavailable to assist, Plaintiff Saucedo might well execute her ballot application and affidavit envelope independently.  Without a person assisting with the execution of the documents (and the signed statement of such assistant), Plaintiff Saucedo faces

disenfranchisement.

**B.   The Law as Amended Does Not Provide Equal Access to People With Disabilities.**

Defendants contend that even if her claim is not moot, Plaintiff Saucedo cannot demonstrate that the signature match scheme violates the ADA for three reasons, none persuasive.  *First*, Defendants argue that Plaintiffs' evidence is insufficient because they have not submitted a statistical study or review demonstrating that the percentage of absentee ballots rejected based on the signature match from disabled voters is higher than the percentage of absentee voters who are disabled.  To put it another way, Defendants contend that Plaintiffs must show with statistics that disabled absentee voters are *more* excluded by the signature match than are nondisabled absentee voters.  This is not the law.  Second, Defendants argue that the evidence does not demonstrate that the statute, as amended, is discriminatory.

Plaintiff Saucedo contends that the signature match requirement constitutes an eligibility criteria or method of administration that discriminates against, excludes, and screens out her and other absentee voters on the basis of disability in violation of the ADA.  No language in the regulations at issue here suggests that the statistical showing demanded by Defendants is required.  Rather, the breadth of the words and phrases selected, such as "screen out or tend to screen out" . . . an individual with a disability or a class of individuals with disabilities," and "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," *see* 28 C.F.R. § 35.130(b)(3)(i), (b)(8), confirms that this type of challenge may be supported by a broad range of evidence that the practice in fact functions to screen out an individual (or a class of individuals) on the basis of disability.  While supporting evidence may include statistics, it may also include the experience of the plaintiff, expert and non-expert testimony about disabilities

and their effects, and a common sense causation analysis regarding the inevitable impact of

particular policies upon persons with certain types of disabilities.

For example, a person with no hands is screened out by a requirement that all applicants

to a college pass an entrance exam with a manual, fill-in-the-bubbles Scantron answer sheet;

there is no need for a statistical study of the impact of the requirement upon a group of applicants

without hands compared to another group with hands.  *Accord Guckenberger v. Boston Univ.*,

974 F. Supp. 106, 114–15, 137-38 (D. Mass. 1997) (finding that a university's new and revised

documentation requirements for reasonable accommodations violated the ADA and the

Rehabilitation Act "because they were 'eligibility criteria' that 'screen[ed] out or tended to

screen out' students with specific learning disabilities").  Construing an analogous provision

found in Title I of the ADA, the Equal Employment Opportunity Commission explained:

> It is not necessary to make statistical comparisons between a group of people with
> disabilities and people who are not disabled to show that a person with a disability is
> screened out by a selection standard. . . . Often, there may be little or no statistical data to
> measure the impact of a procedure on any 'class' of people with a particular disability
> compared to people without disabilities.  As with other determinations under the ADA,
> the exclusionary effect of a selection procedure usually must be looked at in relation to a
> particular individual who has particular limitations caused by a disability.

Equal Employment Opportunity Comm'n, A Technical Assistance Manual on the

Employment Provisions (Title I) of the Americans With Disabilities Act § 4.3(2) (Jan. 1992),

*available at* https://askjan.org/links/ADAtam1.html#VI; *accord* 45 C.F.R. pt. 84, app. A

(explaining that "a statistical showing of adverse impact" is not required for claims under

analogous Rehabilitation Act regulation).

In this matter, a disabled voter like Plaintiff Saucedo is vulnerable to being screened out

by the signature match because her handwriting is impaired by her disability.  Plaintiff Saucedo

is not showing through an academic statistical analysis that she is x% more likely to be screened

out by a "neutral" practice; rather, she is showing *directly* that a screen based on a consistent

signature is likely to exclude her – and many others – on the basis of disability because disability

affects handwriting.  Plaintiffs' evidence includes Plaintiff Saucedo's impaired ability to write

based on her disability.  It includes the many additional disabled people whose ballots were

rejected based on the signature match.  And it includes the expert testimony of Dr. Mohammed

regarding the negative impact of disabilities on the ability of individuals to create consistent

signatures.  This evidence demonstrates that the signature match requirement imposes a

disability-based screen-out.  Such effects are only permitted if Defendants can demonstrate that

the components of their current system are necessary.  28 C.F.R. § 35.130(b)(7), (8).  Because

notice and an opportunity to cure is feasible and would ameliorate the impact on people with

disabilities, Defendants cannot prevail.

     *Second*, Defendant contends that the 2017 amendments to the law cure the problem.  The

2017 amendments exempt a subset of disabled absentee voters from the signature match

requirement.  However, disabled absentee voters who execute their voter documents themselves

remain subject to the requirement, and vulnerable to disenfranchisement based on disability.  For

all of the reasons stated in Section I(B)(c) *supra*, the amended statue continues to violate the

ADA.

     *Third*, Defendants claim that Plaintiff Saucedo does not seek a reasonable modification.

In fact, she does seek a reasonable modification – notice of a signature mis-match and an

opportunity to cure to have her vote counted.  28 C.F.R. § 35.130(b)(7)(i).  Given the modest

numbers of absentee ballots rejected for signature mismatch, and the even smaller number of

absentee ballots rejected for signature mismatch from individuals voting absentee based on

disability, this obvious modification is feasible and imposes no undue burden or fundamental alteration.  *See id.*; 28 C.F.R. § 35.164.  Plaintiffs are entitled to judgment.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment.

Respectfully submitted,

MARY SAUCEDO,
MAUREEN P. HEARD, and
THOMAS FITZPATRICK, D.B.A.

By and through their attorneys affiliated with the American Civil Liberties Union of New Hampshire Foundation and the American Civil Liberties Union Foundation,

*/s/ Julie A. Ebenstein*
Julie A. Ebenstein**
Dale E. Ho**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Voting Rights Project
125 Broad Street, 17th Floor
New York, NY 10004
Tel.: 212.549.2500
jebenstein@aclu.org
dho@aclu.org
** admitted *pro hac vice*

Gilles R. Bissonnette (N.H. Bar. No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH  03301
Tel.:  603.224.5591
gilles@aclu-nh.org

Paul Twomey (N.H. Bar No. 2589)
44 Ring Road
Chichester, NH  03258
Tel.: 603.568.3254
paultwomey@comcast.net

Claudia Center**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA  94111
Tel.: 415.343.0781
ccenter@aclu.org
** admitted *pro hac vice*

Dated:   May 18, 2018

**CERTIFICATE OF SERVICE**

I, Julie A. Ebenstein, hereby certify that a copy of the foregoing document, filed through the

CM/ECF system, this 18th day of May 2018 will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF).

*/s/Julie A. Ebenstein*
Julie A. Ebenstein